STATE of Minnesota, Respondent,

v.

Kyle John KELBEL, Appellant.

No. C8–01–1699.

Supreme Court of Minnesota.

Aug. 8, 2002.

Office of the MN State Public Defender, Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Two-year-old Kailyn Marie Montgomery died in her home while under the care of appellant Kyle John Kelbel. Following Kailyn's death, Kelbel was convicted of first-degree murder, past pattern of child abuse, in violation of Minn.Stat. § 609.185(5) (2000), and second-degree murder, in violation of Minn.Stat. § 609.19, subd. 2(1) (2000). He was sentenced to life in prison. Kelbel's first argument on appeal is that the district court erred in failing to instruct the jury that it must find that the state proved beyond a reasonable doubt each of the acts that constituted the past pattern of child abuse. Second, he argues that the evidence was insufficient to prove that he committed a past pattern of child abuse against Kailyn. We affirm.

On December 4, 2000, two-year-old Kailyn Montgomery died in her home while under the care of appellant Kyle John Kelbel. Kelbel, then 19 years old, was the boyfriend of Kailyn's mother, Lindsey Ostler. Kelbel was living with Lindsey and Kailyn in a home shared with Lindsey's father, George Ostler, and Ostler's five-year-old son, Evan.

On December 4, Kelbel was caring for both Kailyn and Evan while Lindsey and Ostler were at work. At 2:56 p.m., Kelbel called 911 and said that Kailyn "got hit in the head with a cup today by her little brother and she has a bruise on her head and like she is like not breathing right now." Officer Mark Aldrich was the first

to arrive at the Ostler home in response to the 911 call. Aldrich observed that Kailyn's lips were blue, her skin was cool and pale, and her eyes were glazed. He also saw that she had some vomit in and around her mouth and had a big bruise on her forehead. As Aldrich was about to begin CPR, Officer Paul Theines, a paramedic, arrived and took over Kailyn's care.

Theines later testified that when he arrived, he saw Kelbel standing over Kailyn looking stressed and worried about Kailyn. Theines cut off Kailyn's shirt to begin CPR and saw several bruises on her chest. While Theines was trying to help Kailyn, Aldrich asked Kelbel what happened. According to Aldrich, Kelbel said that around 12:38 p.m., Evan and Kailyn were at the kitchen table and Evan threw a sippy cup full of milk at Kailyn and hit her in the head. Theines testified that when he heard Kelbel's sippy cup story, he did not believe that a plastic cup thrown by a five-year-old could have caused Kailyn's injury.

An ambulance transported Kailyn to the hospital. When she arrived, Dr. Edward Feinstein worked for 40 minutes to revive her, but pronounced her dead at 4:00 p.m. While trying to help Kailyn, Feinstein observed many bruises on her chest, forehead, abdomen, and arm.

Kelbel's Police Interviews

The Maplewood police arrested Kelbel at the scene and interviewed him twice that day. Officer Kevin Johnson conducted the first interview. According to Johnson, Kelbel stated that he, Kailyn, and Evan were together at home that morning, went to the dentist a short time before 11:00 a.m., and returned home around 11:40 a.m. They then ate lunch. Because Evan was not eating his lunch, Kelbel told him that he needed to eat or Kelbel would take the food away. Evan told Kelbel to take the food away, so Kelbel took the plate and turned away from Evan. Just then, Kelbel heard an object hit something and then heard the object hit the table and then the floor. Kelbel turned around and saw Kailyn point to her head. Kailyn then said, "Evan hit me." Kelbel observed a sippy cup on the floor behind Kailyn and a red mark on Kailyn's forehead. Kelbel told Johnson that Kailyn did not cry and did not seem to be upset.

Johnson testified that Kelbel told him that he and Kailyn drove Evan to the school bus stop and then returned home. During this time, Kailyn was not crying and was "acting normal." Kelbel said he called Lindsey and left a message around 2:00 p.m. Johnson testified that Kelbel said that Lindsey called him that afternoon and he told her about the sippy cup and the forehead bruise. Although Kelbel told Lindsey that he wanted to take Kailyn to the doctor right away, Lindsey said that she would take care of it after work.

Officer Johnson also testified that at this point in the interview, he was concerned whether Kelbel's account of events would match the medical examiner's findings regarding Kailyn's physical condition. For this reason, he asked Kelbel several times whether there was anything else that could have caused Kailyn's injury. According to Johnson, Kelbel said that the sippy cup incident was the only thing that had happened and that nothing else could have done it. Kelbel then said that when he and Kailyn got home after dropping Evan off at the bus stop, they went into Ostler's bedroom where the computer was located. Kailyn lay on the bed while Kelbel was using the computer. Kelbel noticed that Kailyn was breathing heavily, hyperventilating, so he asked her if she was all right. Kailyn indicated that she was fine. When Kelbel noticed that Kailyn's breathing stopped, he called 911.

According to Johnson, Kelbel said that he did not like watching Evan and Kailyn

at the same time. Kelbel told him that Lindsey was skeptical about having Evan and Kailyn staying at home together. Kelbel also said that Evan hurts people. At some point during this first interview, Kelbel told Johnson that he wanted to know what was going on with Kailyn because he loved her.

Approximately two hours after the end of the first interview, Johnson and Special Agent Jeff Hansen interviewed Kelbel for a second time. Johnson testified that at this interview, he informed Kelbel that Kailyn had died. Kelbel asked to see Lindsey, cried, and said he loved Kailyn as if she were his own child. Hansen testified that Kelbel was unable to answer questions for some time because he was crying. Johnson asked whether the sippy cup caused Kailyn's forehead injury and Kelbel insisted that it must have been the cause.

Kelbel was then released from custody and agreed to return for a third interview the next day. He returned the next day and Hansen and Captain Mike Ryan conducted this interview. Hansen testified that Kelbel told them that two days before Kailyn died, he had caught Evan putting a pillow over Kailyn's face. Kelbel said that after removing the pillow, he saw that Kailyn's eyes were shaking and her lips were blue. He also said that Kailyn's balance after this incident was "off" and that she was swaying back and forth.

According to Hansen, Kelbel again told them about the sippy cup incident. Kelbel said that after this incident, Kailyn's "balance was off." He also related the events prior to Kailyn's death and explained that after dropping off Evan, they returned home and went into Ostler's bedroom. While Kelbel was downloading music or listening to music, he turned down the volume to listen to Kailyn's breathing. When Kelbel heard that Kailyn had stopped breathing, he called 911.

Hansen testified that during this third interview, he asked Kelbel if he went outside sometime between the time he arrived home from dropping Evan off at the bus stop and the time the police arrived. Kelbel said that while Kailyn was watching cartoons, he went outside, possibly to have a cigarette. Kelbel told Hansen that while he was outside, he talked to a 15–year–old neighbor for five to ten minutes. When Kelbel went back inside the house, Kailyn asked for something to drink and he gave her a sippy cup with some milk in it. Kelbel listened to music for about 15 minutes and then noticed that Kailyn was having trouble taking deep breaths.

Hansen testified that he asked Kelbel if Kailyn had fallen down any stairs or had been in a car accident. Kelbel said no. Hansen also asked whether Kailyn had had stomach pain that day. Kelbel responded that she had a stomach ache a few days before her death. Next, Hansen said that the medical examiner had found that Kailyn had died of very forceful blunt trauma to the abdomen and that she bled to death internally. Kelbel responded, "What could have caused that?" Hansen answered that such an injury could have been caused by someone striking Kailyn in the stomach with something like a fist, shoe, or knee. Hansen told Kelbel that Kailyn's injury could not have been caused by a sippy cup.

According to Hansen, he then told Kelbel that if something had happened to Kailyn that was "beyond [his] control," such as a fall or playing rough, Kelbel needed to tell them now. After Kelbel repeatedly denied that there had been an accident, Hansen asked Kelbel whether Kailyn's breathing had been normal before he went outside and spoke with the neighbor. Kelbel said that Kailyn's breathing had been fine. Hansen then told Kelbel that the neighbor had told the police that

Kelbel had said that Kailyn was "breathing funny." Kelbel then changed his story and acknowledged that he told the neighbor that Kailyn's breathing was messed up and that she had been having trouble breathing.

Hansen also testified that Kelbel changed his story regarding the sippy cup incident and admitted that Evan did not throw the cup at Kailyn. Kelbel explained that he, Kailyn, and Evan had all been walking down the stairs when Evan tripped Kailyn. Kailyn then brushed up against the back of Kelbel's leg. As Kelbel attempted to stop Kailyn from falling, the back part of his thigh fell on Kailyn. Ryan expressed disbelief with Kelbel's explanation. Ryan again expressed disbelief and said that Kelbel would have had to land on Kailyn with something like a foot, fist, or elbow to cause the injury that Kailyn had. Kelbel responded, "Swear to God that's what happened" and then said that he landed on Kailyn with the side of his knee. He then said that he fell on Kailyn with the side of his leg. Kelbel next explained that Kailyn obtained the forehead injury after falling down the stairs and hitting her head on a door at the bottom. He then reenacted the fall for Hansen and Ryan. Although Ryan expressed disbelief about Kelbel's version of events, Kelbel insisted that it was the truth.

Lindsey's Police Interview

Hansen also interviewed Lindsey on December 4. According to Hansen, Lindsey said that Evan had outbursts against Kailyn for the past few months, including pulling Kailyn's hair and punching her in the back. Because of this behavior, Lindsey separated Kailyn and Evan at the dinner table. Lindsey also said that she observed bruises on Kailyn from an incident in which Evan placed a pillow over Kailyn's face and from an incident in which Kailyn fell while trying to balance on a glide rocker and a couch. With respect to Kelbel, Lindsey told Hansen that Kelbel cared for Kailyn no more than ten times and that Kailyn had one accident under his care. Lindsey also said that Kelbel never disciplined Kailyn, that she never saw him become violent or frustrated with Kailyn, and that he was gentle and kind toward Kailyn.

Kelbel's Indictment and Trial

Seven months later, Kelbel was indicted for first-degree murder under Minn.Stat. § 609.185(5) and second-degree murder under Minn.Stat. § 609.19, subd. 2(1). At his trial, there was extensive testimony from numerous witnesses about the events of December 4. Ostler and Lindsey testified that Kelbel was alone caring for Evan and Kailyn on December 4. According to Lindsey, Kailyn had no facial injuries that morning. Later that morning, Kelbel brought Evan and Kailyn with him to the dentist where he underwent a dental examination between 10:30 and 11:00. The nurse and the receptionist at the dental office, who had the opportunity to observe Kailyn, testified that at that time Kailyn had no apparent injuries and did not appear to be in pain.

The state introduced a message from Lindsey's cell phone. The message showed that Kelbel called Lindsey's cell phone number at 12:42 p.m. and asked her to call him immediately. Lindsey left her cell phone at home that day and did not receive Kelbel's message, but she called Kelbel at about 1:30 p.m. to find out how the children were doing. According to Lindsey, Kelbel said that Evan had thrown a sippy cup at Kailyn at the kitchen table, Kailyn had a huge bruise on her forehead, and she was "a little off." Lindsey testified that based on Kelbel's account, Kailyn's injury did not seem serious. For this reason, she told Kelbel that she would take

Kailyn to urgent care when she was done with work at 3:30 p.m.

The neighbor testified that he visited with Kelbel outside Ostler's home around 2:30 p.m. They spoke to each other for about 10 minutes. According to the neighbor, Kelbel mentioned that Kailyn was having trouble breathing.

In addition to Officers Aldrich and Theines, several other officers responded to Kelbel's 911 telephone call, including Sally Dunn, a child abuse investigator and paramedic. Dunn testified that she had previously been to the Ostler home in September 2000 in connection with a suspected child abuse incident involving Kailyn. When Dunn arrived at the home on December 4, she saw a large bruise on Kailyn's forehead and bruises on her chest and abdomen. She believed that the injuries were not caused by a thrown sippy cup and immediately declared the home a crime scene so that evidence could be preserved undisturbed.

Dunn testified that Ostler's home was secured and officers returned on December 5 with a search warrant and conducted a search. The next day, after he was permitted to reenter the home, Ostler called the police to inform them of a dent in the basement wall which he had not seen before. The police returned to measure and photograph the dent, which was a circular indentation near Kailyn's bed.

Medical Examiner's Testimony

Dr. Michael McGee, the Ramsey County Medical Examiner, testified that he performed an autopsy on Kailyn on December 5. According to McGee, Kailyn had 84 separate soft tissue injuries on her body, including her head, chest, back, and both arms and legs. McGee believed most of the injuries were incurred between two and seven hours before Kailyn's death.

McGee testified that Kailyn's death was caused by exsanguination due to blunt trauma to the abdomen as a result of child abuse. According to McGee, a tremendous blunt force, such as a fist or knee concentrated on Kailyn's abdominal region, was necessary to cause Kailyn's injuries. A fall like the one described by Kelbel to the police could not have caused Kailyn's internal injuries because such a fall could not have generated enough force to produce such injuries. In McGee's view, Kailyn's injuries could not have been caused by a fall down the stairs even if Kelbel had landed on her abdomen with his knee.

With respect to Kailyn's other injuries, McGee testified that her forehead had a large bruise, an abrasion, swelling above the right eye, and multiple contusions above both eyebrows. According to McGee, the abrasion could have been caused by a thrown sippy cup, but a thrown cup could not account for the total area of bruising, which would have required a great deal of force and multiple blows. McGee also testified that Kailyn had multiple bruises on the left and right sides of her head, her right cheek, and her chest and upper abdomen as well as burn injuries on her left hand. He testified that the injuries to Kailyn's forehead were likely caused by multiple blows to her head with some blunt object. McGee testified that the injuries on the back of Kailyn's head were consistent with the back of her head "impacting" the basement wall.

McGee testified that he believed that Kailyn's injuries were inflicted rather than accidental. He concluded that the manner of death was homicide with multiple traumatic injuries. McGee also concluded that Kailyn was a battered child, a child who has received multiple injuries in a repetitive manner over a period of time. McGee based his opinion on his autopsy findings, as well as Kailyn's medical records containing information regarding her previous visits to the clinic and the hospital.

Kailyn's Previous Injuries

In addition to the evidence surrounding the events of December 4, the state presented evidence regarding injuries Kailyn suffered before that date. Lindsey testified that Kailyn was born on June 2, 1998, and lived with Lindsey and Lindsey's mother in Wisconsin until June 5, 2000. On June 5, Kailyn and Lindsey moved to Maplewood, Minnesota to live with Ostler so that Lindsey could attend college. Until June 5, Kailyn was cared for by Lindsey and Lindsey's mother. Both Lindsey and her mother testified that while Kailyn was living in Wisconsin, she suffered no unexplained injuries. Lindsey also testified that while living in Wisconsin, Kailyn occasionally visited Ostler and Evan in Maplewood and she never suffered any unexplained injuries as a result of those visits. Lindsey also testified that Kailyn suffered no unexplained injuries before August 2000.

From June 5, 2000 until mid-August 2000, Judy Thompson, a neighbor, cared for Kailyn during the day. Lindsey and Thompson testified that during this period, Kailyn suffered no unexplained injuries. According to Thompson, Kailyn and Evan got along well and Thompson never saw Evan intentionally harm Kailyn.

Lindsey, who was 17 at the time of the trial, testified as to Kelbel's relationship with her and Kailyn. Lindsey and Kelbel met in January 2000 and began dating in March. At that time, Lindsey and Kailyn lived in Wisconsin. Lindsey said that when she lived in Wisconsin, Kelbel never took care of Kailyn alone. After Lindsey and Kailyn moved to Minnesota on June 5, 2000, Kelbel visited Lindsey in mid-August and moved into the Ostler home at that time. At the end of August, Lindsey was working and going to school. Lindsey testified that at this time, Kelbel worked sporadically and cared for Kailyn alone twice a week for two or three weeks. Judy Thompson took care of Kailyn the other days of the week.

Lindsey testified that at the end of August and throughout September, she observed unexplained bruising on Kailyn's face, arms, chest, and back. According to Lindsey, there were new bruises every three or four days as well as occasional bite marks. Lindsey stated that on August 29, Kelbel told her that Kailyn fell out of the crib and hit her face. Both Lindsey and Thompson testified that they observed injuries on Kailyn's face that day. Thompson testified that she never had a problem with Kailyn crawling or falling out of her crib or Evan pulling her out. Thompson also testified that after August 29, the injuries never seemed to go away, they would just move. According to Thompson, Kailyn's injuries would be smaller one day and bigger the next day.

Lindsey testified that she was concerned about these recurring bruises and took Kailyn to a doctor on September 7. Lindsey and the doctor both testified that Lindsey told the doctor that she did not know the cause of the bruises, which began two or three weeks earlier. The doctor requested testing to determine if there was anything wrong with Kailyn. Lindsey told the doctor that Kailyn's only care providers were her and the babysitter. The doctor testified that Kailyn was pale and withdrawn and had bruises on her forehead, shins, lower back, and cheeks. He also testified that the injuries indicated abuse, but he ordered blood tests to rule out medical causes. All the tests came back normal.

Lindsey testified that on September 13, she brought Kailyn to the hospital. At that time, Kailyn had bruises on her face, arms, and chest and Lindsey was concerned something was medically wrong. Lindsey and Kailyn saw a pediatric nurse, who documented the bruising. The nurse

testified that Lindsey said that the unexplained bruising had been occurring for four weeks, that she had seen a doctor a week earlier, and that the results of the blood tests taken at that time were normal. The nurse ordered further laboratory tests and ruled out medical reasons for Kailyn's condition. Also, on this occasion, Officer Theines came to the hospital and observed the multiple bruises on Kailyn. Theines testified that Lindsey told him she did not know how the bruises occurred, that Kailyn had begun getting the bruises three or four weeks earlier, and that new bruises occurred every three or four days. Theines testified Lindsey told him that Kelbel had moved in four weeks earlier and that he could not have caused Kailyn's injuries and that he was rarely alone with her.

As a result of Lindsey's visit to the hospital, Kailyn was placed in foster care from September 13 to October 2. During this time period, Kailyn's injuries healed and she was free of injury when she returned home. Kailyn incurred no new injuries until mid-November, when Kelbel told Lindsey that Kailyn had fallen in the bathtub. Lindsey testified that she then observed that Kailyn had bruises on her back. Just before Thanksgiving, Lindsey started a new job and, as a result, asked Kelbel to care for Kailyn while she was working. The day after Thanksgiving, Lindsey's mother, who was visiting, noticed that Kailyn had a burn on her left hand and asked Lindsey about it. Lindsey's mother testified that Lindsey said that Kailyn was in the bathroom with her while she was taking a shower and Kailyn must have picked up a burning candle. Before trial, Lindsey gave this same account of events to the police. However, at trial, Lindsey admitted that she lied to protect Kelbel. Lindsey testified that Kelbel had told her that Kailyn was in the bathroom with him and that she had been burned by hot candle wax. Lindsey testi-

fied that she lied because even though she had never seen Kelbel hurt Kailyn, she was concerned that others would think he did. Thompson testified that on November 28 or 29, she noticed that Kailyn had bruises up and down her rib cage.

On December 2, Lindsey was at work and Kelbel cared for Kailyn. Lindsey testified that when she returned home, Kelbel told her he had found Evan sitting on Kailyn's chest trying to smother her with a pillow. Lindsey testified that at that time she observed bruises on Kailyn's chest and chin and again that night, when she gave Kailyn a bath. She showed the bruises to Ostler. Lindsey testified that Kailyn's injuries could have been caused when Kailyn fell on her chest on the carpet while she was playing between a reclining rocker and a sofa.

Lindsey testified that she never saw Kelbel become violent or frustrated with Kailyn and that Kelbel was very gentle with her. Lindsey and Ostler both acknowledged that Evan was rough with Kailyn. They also testified that one of the two Rottweilers which lived in the Ostler home occasionally knocked Kailyn over, causing her to fall on her bottom. However, Lindsey also testified that in September she had lied to the police, her mother, Thompson, and the medical professionals who had seen Kailyn in order to protect Kelbel. She acknowledged that she did not reveal the extent to which Kelbel cared for Kailyn. She also acknowledged that even though she did not observe certain injuries to Kailyn, she sometimes told others that she observed certain injuries to Kailyn that Kelbel had described to her. Lindsey testified that she thought Kelbel would never hurt Kailyn, but worried that others would think that he had.

Jury Instructions and Verdict

Before closing arguments, Kelbel requested in writing an instruction regarding

past pattern of child abuse under section 609.185(5). Kelbel proposed the following instruction: "Each alleged incident of child abuse that comprises the 'past pattern of child abuse' must be proven beyond a reasonable doubt." The district court rejected Kelbel's request and instructed the jury regarding section 609.185(5) in the following manner:

First, the death of Kailyn Marie Montgomery must be proven. Second, Kailyn Marie Montgomery was a minor. A minor is a person under the age of 18 years. Third, the death of Kailyn Marie Montgomery occurred while the defendant was committing child abuse. Minnesota statutes defined "child abuse" as assault. Fourth, the defendant engaged in a past pattern of child abuse upon Kailyn Marie Montgomery. The term "pattern" may be taken to have its common and ordinary meaning. Fifth, the death of Kailyn Marie Montgomery occurred under circumstances that manifested an extreme indifference to human life. Sixth, the defendant's acts took place in Ramsey County on or about December 4, 2000, and prior to December 4, 2000, with respect to the element of a past pattern of child abuse. If you find that each of these six elements has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.

After deliberating, the jury found Kelbel guilty of first-degree murder, past pattern of child abuse, and second-degree murder. Kelbel was then sentenced to life in prison.

Post–Trial Motion and Appeal

On July 23, Kelbel made a motion for a judgment of acquittal and for a new trial on the grounds that the evidence was insufficient to support his conviction. More specifically, he argued that the only evidence that he committed a past pattern of child abuse was

a coincidence with respect to the bruising on [Kailyn] and his presence in the home. In order to reach a conclusion beyond a reasonable doubt on circumstantial evidence, all circumstances proved must be inconsistent with any other rational conclusion. There was credible evidence of several other sources for the bruising.

The district court denied Kelbel's motion. In a memorandum of law accompanying its order, the court explained that it rejected Kelbel's requested jury instruction regarding past pattern of child abuse because it believed that *State v. Cross*, 577 N.W.2d 721 (Minn.1998), remained good law after *State v. Crowsbreast*, 629 N.W.2d 433 (Minn.2001). Then, the court explained its ruling in the following manner:

There is no evidence that the child ever was able to articulate the source of her significant bruising. As a result, the state's only evidence of the past pattern of child abuse by defendant consisted wholly of circumstantial evidence of that pattern, and no specific acts of abuse by defendant. Defendant's requested instruction regarding past pattern would render it impossible to prove the crime charged in the absence of eyewitness accounts of past abuse, or defendant's admissions. A child in the age range of 30 months simply cannot engage in self-reporting of abuse. As a result, this court rejects the argument that Minn. Stat. § 609.185(5) is analogous to the federal Continuing Criminal Enterprise (CCE) Statute found at 21 U.S.C. § 848(a) (1994).

For these reasons, the court concluded that a conviction under section 609.185(5) may be had by proof beyond a reasonable doubt using circumstantial evidence of a specific past pattern of child abuse rather

than direct or circumstantial evidence of each act of child abuse that comprise the past pattern.

Kelbel's first argument on appeal is that the district court erred in failing to instruct the jury that in order to convict him of first-degree murder, past pattern of child abuse, the jury must find beyond a reasonable doubt that he committed each of the acts which constituted the past pattern of child abuse. Second, he argues that the evidence presented at trial was not sufficient to prove that he committed a past pattern of child abuse against Kailyn.

## I.

■ Kelbel first contends that in order to be convicted under section 609.185(5), the state must prove that he engaged in a past pattern of child abuse. He asserts that the district court violated his federal and state due process rights by refusing his request for an instruction that each alleged incident of abuse that comprises a past pattern of child abuse must be proven beyond a reasonable doubt. More specifically, Kelbel argues that the language "past pattern of child abuse" in the statute creates several elements and that every element of a crime must be proven beyond a reasonable doubt to satisfy due process. In support of his argument, Kelbel cites to *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that every fact necessary to constitute the crime must be proven beyond a reasonable doubt).

To evaluate Kelbel's constitutional due process claim, we must determine whether section 609.185(5)'s language referring to a "past pattern of child abuse" creates a single element or whether the statute makes each incident of child abuse a separate element, each of which must be proven beyond a reasonable doubt. This determination is a matter of statutory construction, which we review de novo.

*Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190 (Minn.1990).

Section 609.185(5) provides that a person is guilty of first-degree murder when he

causes the death of a minor while committing child abuse, when [he] has engaged in a past pattern of child abuse upon the child and the death occurs under circumstances manifesting an extreme indifference to human life.

Minn.Stat. § 609.185(5). The language regarding "past pattern of child abuse" mirrors the language used in section 609.185(6), which addresses the issue of past pattern of domestic abuse. Section 609.185(6) provides that a person is guilty of first-degree murder when he

causes the death of a human being while committing domestic abuse, when [he] has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life.

Minn.Stat. § 609.185(6) (2000).

We have previously addressed whether the language "past pattern of domestic abuse" in section 609.185(6) creates one element or several elements. In *Cross*, we rejected the argument that each underlying act offered as evidence of a "past pattern of domestic abuse" is a separate element of the crime of domestic abuse homicide, requiring proof beyond a reasonable doubt as to each underlying act of abuse. 577 N.W.2d at 726–27. We said that such an argument "ignores the plain language of the statute." *Id.* at 726. Thus, we concluded that the state need not prove each of the alleged underlying acts beyond a reasonable doubt as long as the state has proven sufficient acts to establish, beyond a reasonable doubt, a pattern of such acts of domestic abuse. *See id.* That is, if the state presents evidence

of underlying acts A, B, C, and D, it is not reversible error for there to be insufficient evidence of D, if A, B, and C are sufficient to establish a pattern of domestic abuse beyond a reasonable doubt. While the plain language of the statute supported our conclusion, we also pointed out that in the absence of clear statutory direction, requiring proof beyond a reasonable doubt as to each of the acts constituting a "past pattern of domestic abuse" would "create an unnecessarily heavy burden on the state" in light of the fact that domestic abuse offenses are "among the most underreported crimes in America." *Id.* at 727.

Following our decision in *Cross*, the United States Supreme Court decided *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). In *Richardson,* the defendant challenged the jury instructions given by the district court concerning a charge under 21 U.S.C. § 848(a) (2000), the federal Continuing Criminal Enterprise (CCE) Statute. 526 U.S. at 815–16, 119 S.Ct. 1707. This statute forbids any person from engaging in a "continuing criminal enterprise" and defines this term as involving a violation of the controlled substances statutes where such violation "is a part of a continuing series of violations." 21 U.S.C. § 848(a), (c).

In *Richardson,* the Supreme Court held that the language of the statute, tradition, and potential unfairness supported a reading of the term "series of violations" as constituting several elements rather than one element. *Id.* at 820, 824, 119 S.Ct. 1707. The Court examined the term "vio-

lations" and observed that this term referred to an act or conduct that is contrary to law. *Id.* at 818, 119 S.Ct. 1707. Because the Court found no legal source defining the word "violations" as the means the defendant used to commit an element,[1] the Court concluded that the language of the statute supported a reading of "violations" as elements. *Id.* at 817–18, 119 S.Ct. 1707.

Next, the Court concluded that to hold that each "violation" amounts to a separate element was consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. *Id.* at 818–19, 119 S.Ct. 1707. Finally, the Court concluded that the CCE statute's breadth aggravates the dangers of unfairness that treating each violation as a means rather than an element would risk. *Id.* at 818–20, 119 S.Ct. 1707. More specifically, the Court stated that the statute's breadth aggravated the danger that violations would be treated as simply alternative means by which the defendant satisfied a single element. *Id.* at 819, 119 S.Ct. 1707. This would permit the jury to avoid discussion of the specific factual details of each violation and cover up wide disagreement among the jurors about which violations the jurors believe the defendant committed. *Id.* The Court also expressed its concern that jurors would fail to focus upon specific factual detail and might rely on bad character evidence in concluding that the defendant is guilty. *Id.* Based on these considerations of language, tradition, and unfairness, the Court held that the

---

1. In *Richardson,* the Court gave the following example to illustrate the difference between an element and the means the defendant used to commit an element. The Court said:

   Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might

conclude he used a gun. But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.

526 U.S. at 817, 119 S.Ct. 1707.

CCE statute required jury unanimity with respect to each individual violation alleged to make up the series of violations. *Id.* at 824, 119 S.Ct. 1707.

In *Richardson,* the Court rejected the government's argument that there was a history or tradition of treating individual criminal violations as means toward the commission of a greater crime. *Id.* at 821, 119 S.Ct. 1707. The Court stated that certain state statutes regarding sexual abuse of a minor are among the few examples of criminal statutes that do not define the crime in terms that require the commission of other predicate crimes by the defendant. The Court said:

> The closest analogies [the government] cites consist of state statutes making criminal such crimes as sexual abuse of a minor. State courts interpreting such statutes have sometimes permitted jury disagreement about a "specific" underlying criminal "incident" insisting only upon proof of a "continuous course of conduct" in violation of the law. With one exception, the statutes do not define the statutory crime in terms that require the commission of other predicate crimes by the defendant.

*Id.* at 821, 119 S.Ct. 1707 (citations omitted).

The Court then explained that the state sexual abuse statutes do not typically define the crime in terms that require the commission of other predicate crimes because of the difficulties of proving the individual underlying criminal acts. The Court said:

> The state practice may well respond to special difficulties of proving individual underlying criminal acts, which difficulties are absent here. The cases are not federal but state, where this Court has not held that the Constitution imposes a jury-unanimity requirement. And their special subject matter indicates that

they represent an exception; they do not represent a general tradition or rule. *Id.* at 821–22, 119 S.Ct. 1707 (citations omitted). In acknowledging the special subject matter of the sexual abuse statutes, the Court strongly suggested that the CCE statute was distinguishable from the state sexual abuse statutes where the crime is not defined in terms that require the commission of other predicate acts.

Following *Richardson,* we were asked to revisit the issue of whether each underlying act offered as evidence of "past pattern of domestic abuse" was a separate element of the crime of domestic abuse homicide. In *Crowsbreast,* we held that the district court did not commit plain error by failing to instruct the jury that each past incident of abuse alleged to comprise a "past pattern of domestic abuse" must be proven beyond a reasonable doubt. 629 N.W.2d at 438. In reaching this conclusion, it was unnecessary for us to determine the effect that *Richardson* had on the holding of *Cross* because the doubt, if any, that *Richardson* cast on the legal underpinnings of *Cross* would not elevate the alleged error in *Crowsbreast* to plain error. 629 N.W.2d at 438.

Kelbel acknowledges that our holding in *Cross* suggests that the language "past pattern of child abuse" creates one element rather than several elements. Nevertheless, Kelbel claims that *Richardson's* analytical framework compels the conclusion that Minn.Stat. § 609.185(5) creates several elements.

Whether the language "past pattern of child abuse" creates one element rather than several elements is a matter of statutory construction. Under our rules and case law, when the legislature's intent is clearly discernable from plain and unambiguous language, statutory construction is neither necessary nor permitted and we apply the statute's plain meaning. Minn.

Stat. § 645.16 (2000); *State v. Grossman,* 636 N.W.2d 545, 550 (Minn.2001). In *Cross,* we concluded that the plain language of the domestic abuse statute does not specify that proof beyond a reasonable doubt is required as to each of the underlying acts of abuse. 577 N.W.2d at 726–27. In the absence of clear statutory direction, we refused to require proof beyond a reasonable doubt as to each of the acts constituting a "past pattern of domestic abuse" because such a requirement would create an unnecessarily heavy burden on the state. *Id.* at 727. Here, for the same reasons as in *Cross,* we conclude that the plain language of section 609.185(5) does not require proof beyond a reasonable doubt as to each of the acts constituting a "past pattern of child abuse." Thus, section 609.185(5) requires that the state establish, beyond a reasonable doubt, the pattern of abuse. Although the jurors may disagree about which particular acts make up the pattern, they must agree that the state has proven a pattern beyond a reasonable doubt.

Even if we did apply the rules of statutory construction specified in *Richardson,* as Kelbel urges us to do, we would reach the same conclusion. Under *Richardson's* analytical framework, we must examine a statute's language, tradition, and potential unfairness to a defendant to determine whether the language "past pattern of child abuse" creates one or several elements. With respect to the language of the statute, the "past pattern of child abuse" language of section 609.185(5) is similar to the CCE statute's language "series of violations" in that both a series and a pattern require that more than one incident occur. *See Richardson,* 426 U.S. at 819, 96 S.Ct. 2488; *Cross,* 577 N.W.2d at 727 n. 3. In addition, just as the CCE statute at issue in *Richardson* referred to "violations," defined as conduct contrary to the law, section 609.185(5) defines "child abuse" as "an act committed against a minor victim that constitutes a violation of the following laws of this state or any similar laws of the United States or any other state." Minn.Stat. § 609.185. Thus, both the CCE statute and section 609.185(5) state that criminal acts must make up the "series" or "pattern." However, in *Richardson,* the Court failed to find any legal source defining "violations" as a means of committing an offense rather than the offense itself. 526 U.S. at 818, 119 S.Ct. 1707. Here, by contrast, we have our decision in *Cross,* where we concluded that the criminal acts that constituted "domestic abuse" were means of establishing a pattern rather than elements. *See* 577 N.W.2d at 727. Thus, the language of section 609.185(5) weighs in favor of reading "past pattern of child abuse" as creating one element.

The second factor considered by the Court in *Richardson* is tradition. In *Richardson,* the Court distinguished the state sexual abuse statutes from the CCE statute on the grounds that the state sexual abuse statutes typically do not define the crime in terms that require the commission of other predicate crimes. The Court also explained why the state sexual abuse statutes defined the crime in this manner, stating that the underlying criminal acts were difficult to prove. 526 U.S. at 821, 119 S.Ct. 1707. Similarly, in *Cross,* we concluded that the difficulty of proving a past pattern of abuse where domestic abuse crimes are unreported supported the conclusion that the statute did not create several elements. 577 N.W.2d at 727. The same difficulties of proving a past pattern of domestic abuse apply in the context of child abuse. We agree with the district court that the acts constituting a pattern of child abuse are difficult to prove, particularly when a child is so young that she cannot self-report abuse. *See also* Minn.Stat. § 595.02, subd. 3 (2000) (providing that out-of-court state-

ments by a child under age 10 or a person who is mentally impaired may be admissible hearsay when such statements allege sexual or physical abuse). Accordingly, tradition weighs against interpreting "past pattern of child abuse" as creating several elements, each of which must be proven beyond a reasonable doubt.

The third factor considered by the *Richardson* Court was potential unfairness to a defendant. In *Richardson,* the Court was concerned that if the term "series of violations" constituted one element, the jury would not consider the factual details of each violation, covering up wide disagreement among jurors regarding what the defendant did and permitting the jury to convict a defendant on the grounds of bad character. 526 U.S. at 819, 119 S.Ct. 1707. The potential unfairness discussed by the *Richardson* Court could be present in cases involving section 609.185(5). However, the state must prove a pattern beyond a reasonable doubt, and therefore jurors must agree that the state proved beyond a reasonable doubt that a defendant committed some number of acts constituting a past pattern of child abuse. *See Cross,* 577 N.W.2d at 727 n. 3. In addition, even if such potential unfairness were present, both the language of section 609.185(5) and tradition weigh against a reading of "past pattern of child abuse" as creating several elements rather than one element. Thus, even under *Richardson's* analytical framework, section 609.185(5)'s language "past pattern of child abuse" does not create several elements.

Because our rules of statutory construction do not support Kelbel's argument that "past pattern of child abuse" creates several elements, the district court's refusal to give Kelbel's requested jury instruction was within the court's broad discretion. We will not reverse a court's refusal to give a jury instruction absent an abuse of discretion. *State v. Cole,* 542 N.W.2d 43,

50 (Minn.1996). The court instructed the jury that it must find that the state proved each element of the crime of first-degree murder, past pattern of child abuse, beyond a reasonable doubt. Because "past pattern of child abuse" constitutes one element of this crime, we hold that the court did not abuse its discretion.

## II.

▪ Kelbel's second argument on appeal is that the evidence was insufficient to support the verdict. In reviewing a claim of sufficiency of the evidence in a criminal matter, we determine whether a jury could reasonably have concluded that the defendant is guilty of the offense charged. *State v. Johnson,* 568 N.W.2d 426, 435 (Minn.1997). In doing so, we view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Daniels,* 361 N.W.2d 819, 826 (Minn.1985).

Here, the jury could have reasonably concluded that Kelbel was guilty of first-degree murder, past pattern of child abuse. Kailyn was a minor who died as a result of child abuse, defined by the statute as assault. The medical examiner testified that as a result of child abuse, Kailyn died from internal bleeding due to internal injuries resulting from severe blows to the abdomen. He also testified that Kailyn's injuries causing her death occurred two to seven hours before she died. Testimony from Lindsey as well as Kelbel's statements to police indicated that Kelbel was alone with Kailyn on December 4 at the time her injuries were incurred. Further, Kelbel gave conflicting explanations for Kailyn's injuries, ultimately admitting that his initial explanation was false. Moreover, Kelbel's explanations were contrary to the medical evidence. Testimony from Lindsey, Lindsey's mother, Thompson, and

the doctors and nurses who provided medical care to Kailyn before December 4 indicated that Kailyn was a battered child. Testimony from Lindsey, Lindsey's mother, Ostler, and Thompson indicated that the injuries Kailyn sustained before December 4 occurred when Kailyn was alone with Kelbel. When we view all of this evidence in the light most favorable to the verdict, we hold that the evidence was sufficient to support the jury's verdict.

Affirmed.