*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0137**

State of Minnesota,
Respondent,

vs.

Dayna Kristine Bell,
Appellant.

**Filed October 20, 2014
Affirmed
Reyes, Judge**

Dakota County District Court
File No. 19HACR121294

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Stacy St. George, Assistant County Attorney, Hastings, Minnesota (for respondent)

Stephen V. Grigsby, Minneapolis, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Reilly, Judge; and Reyes, Judge.

## UNPUBLISHED OPINION

**REYES**, Judge

On appeal from her conviction of multiple felony counts of animal cruelty, appellant, the owner and operator of a dog kennel that housed over 200 dogs, argues that

(1) the circumstantial evidence was insufficient to sustain her convictions; (2) the state failed to prove the essential element that the dogs were pet or companion animals; (3) the prosecutor committed prejudicial misconduct; (4) the district court erred by restricting the scope of cross-examination and closing argument based on an erroneous understanding of alternative-perpetrator evidence; (5) the district court's reasonable-doubt instruction to the jury was faulty, and the district court erred by denying appellant's request for a rational-hypothesis jury instruction on circumstantial evidence; and (6) the district court erred when it declined to suppress a witness's identification of the dogs. We affirm.

**FACTS**

Appellant Dayna Kristine Bell was the owner and operator of a dog kennel located in Dakota County. In September 2011, police received various reports from three of Bell's former employees that Bell was mistreating the dogs and had drowned puppies. Police executed a search warrant and located the bodies of ten small-breed adult dogs, each in an individual plastic bag, in a freezer chest on the property. The state charged Bell with 14 counts of animal cruelty in violation of Minn. Stat. § 343.21, subd 7. (2010).

Before trial, Bell moved the district court to dismiss the charges because the dogs Bell bred and sold did not meet the definition of pets or companion animals as provided by Minn. Stat. § 343.20, subd. 6 (2010). Bell also moved the district court to suppress the identification of the frozen dogs. The district court denied both of these motions, and a jury trial was held.

At trial, the state presented the testimony of three of Bell's former employees, A.J., J.I., and D.H., Bell's veterinarian, a doctor who examined the dead dogs, the

2

operator of an animal-disposal business, a Humane Society investigator, an employee of the U.S. Department of Agriculture's animal-care division, and two members of the Dakota County Sheriff's Department. Bell's former employees testified to various incidents of Bell mistreating the dogs.

In one incident, A.J. observed that a bitch (count 14) had given birth to a litter of puppies. The puppies were so small that some had fallen between the bars of the cage. In an effort to pull the puppies back up into the kennel, the bitch had bitten off some of the puppies' legs. At least two of the puppies were uninjured, but four were missing legs. Two of the injured puppies had died but the other two were still alive, making sounds and moving. A.J. went to get Bell, who placed the four injured puppies into a bucket of water and covered it, thereby drowning the two injured-but-alive puppies (counts 1 and 2). The Humane Society investigator testified that it is evident when a bitch is going to give birth to its litter and that, two weeks prior to birth, it is necessary for an owner to move the bitch from the general population to a warm, comfortable, and quiet location. This is done because the puppies are small, blind, and helpless, and they need to be secured near their mother such that they cannot fall between the bars of a kennel.

On another occasion, A.J. also helped Bell take dogs (counts 6, 7, 8, 9, and 10) from big kennels and place them in smaller travel kennels. Bell told A.J. that a friend was coming to pick up the dogs. Unbeknownst to Bell, A.J. then observed Bell place a rope around the neck of one of the dogs (count 10), a small black-and-white one; the other end of the rope was attached to a cinder block. Bell threw the dog and the block into a pool of water. A.J. heard the dog "yell but then nothing afterwards."

The next day, a dog (count 11), which had previously nipped A.J., bit Bell on the hand. Bell took the dog from the kennel, and when she returned she stated that "that [motherf-cker] would never bite anybody else again" and that she had broken its neck.

In yet another incident, J.I. witnessed Bell drown a puppy (count 4) that appeared alive and well in a bucket of water. Bell stated that she thought the puppy was too small to live, and she was going to put it out of its misery.

On September 29, 2011, police executed a warrant on Bell's kennel, and deputies discovered the bodies of ten small-breed adult dogs, each in individual plastic bags, in a freezer chest on the property. The appearance of the frozen dogs' fur led investigators to believe that the dogs were wet when they were placed in the freezer. Investigators also found a cinder block that had a rope tied to it and a pool filled with dirty water. There were between 200-250 dogs on the property.

Bell told investigators that there had been a dog that bit her but that she had given the animal to a friend. Bell also initially told investigators that she had no idea what was in her freezer then later told investigators that any dogs that were in the freezer had been euthanized by her veterinarian because they were unadoptable. But Bell's veterinarian testified to the contrary. The veterinarian testified that she only euthanized two large adult dogs for Bell in 2011 and that she did not euthanize any other dogs for Bell. Bell's veterinarian also testified that Bell never consulted her about any puppies that were sick or about the possibility of euthanizing any puppies.

At trial, A.J. identified one of the dogs found in the freezer (count 5) as "Sasha," an older dog that was A.J.'s favorite. A.J. testified that she had asked Bell if she could

4

take Sasha home but that Bell denied her request, stating that she was going to sell Sasha on the Internet for $100. One day, A.J. came to work and Sasha was gone. Bell told A.J. that she had given Sasha away.

A.J. also identified some of the other dogs found in the freezer (counts 6, 7, 8, 9, and 10) as those that Bell moved into smaller kennels and believed one of the dogs (count 10) was the one that she had seen Bell throw into the pool along with the cinder block. A.J. further identified a frozen dog (count 11) as the one that had nipped her and Bell, another as one she had loaded into a cage and wanted to take home with her (count 13) but Bell had told her the dog was going to another kennel, and another (count 14) as the bitch that had recently given birth to puppies. Bell could not specifically identify one of the dogs (count 12), but investigators testified that the dog's fur had significant ice buildup and appeared to have been wet prior to freezing.

The doctor testified that he examined three of the ten dogs taken from the freezer. The dogs examined appeared to have been eating healthily and did not appear to have had any diseases. The doctor noted that two of the dogs had hyperinflated lungs, which can occur when, during the process of dying in agony, the animal struggles for breath. But because the dogs had been frozen and then thawed, the doctor could not definitively determine whether the cause of death had been drowning.

The jury found Bell guilty of 13 out of the 14 counts of animal cruelty. This appeal follows.

**D E C I S I O N**

**I. Sufficiency of Evidence**

Bell challenges the sufficiency of the evidence to sustain her conviction of 13 counts of animal cruelty. In reviewing the sufficiency of the evidence, this court conducts "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow the jurors to reach a verdict of guilty. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Caldwell*, 803 N.W.2d 373, 384 (Minn. 2011) (quotation omitted). "We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100.

Bell argues that there was not sufficient circumstantial and direct evidence of intent to support the jury verdict. When an element of a crime is proved by circumstantial evidence, we apply heightened scrutiny, first identifying the circumstances proved, "deferring to the fact-finder's acceptance of the proof of these circumstances" and rejection of evidence contrary to the circumstances proved. *State v. Hokanson*, 821 N.W.2d 340, 354 (Minn. 2012) (quotation omitted), *cert. denied,* 133 S. Ct. 1741 (2013). We then independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved" without deferring to the fact-finder's choice between inferences. *State v. Al–Naseer*, 788 N.W.2d 469, 473-74 (Minn. 2010)

6

(quotation omitted). To support a conviction, "the circumstances proved must be consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Andersen*, 784 N.W.2d 320, 330 (Minn. 2010).

In contrast, direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Bernhardt v. State*, 684 N.W.2d 465, 477 n.11 (Minn. 2004) (quotation omitted). In other words, "direct evidence, if believed, directly proves the existence of fact without requiring any inferences by the fact-finder." *State v. Silvernail*, 831 N.W.2d 594, 604 (Minn. 2013). As such, we do not apply the same heightened standard to direct evidence that applies to circumstantial evidence. *State v. Porte*, 832 N.W.2d 303, 309 (Minn. App. 2013). Nevertheless, circumstantial evidence is entitled to the same weight as direct evidence. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988).

Bell argues that, because the doctor who examined the dogs could not conclusively state that the dogs were drowned, the dogs could have died from a variety of causes that did not cause them to suffer, including proper euthanasia by a veterinarian. Bell also argues that, as to the puppies, the state did not prove that the drowning of the puppies was unnecessary or unjustifiable. *See* Minn. Stat. § 343.20, subd. 3 (2010) (defining "cruelty" as "every act, omission, or neglect which causes or permits unnecessary or unjustifiable pain, suffering, or death"). These arguments lack merit.

"An alternative theory does not justify a new trial if that theory is not plausible or supported by the evidence," and a conviction based on circumstantial evidence will not be overturned on the basis of mere conjecture. *State v. Lahue*, 585 N.W.2d 785, 789

7

(Minn. 1998). "[P]ossibilities of innocence do not require reversal . . . so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002) (quotation omitted). Here, the evidence adduced at trial, viewed in the light most favorable to the verdict, establishes Bell's guilt of 13 counts of animal cruelty.

At trial, A.J. and J.I. testified that Bell had drowned puppies (counts 1, 2, and 4) and one dog (count 10). For example, A.J. testified to witnessing Bell drown one of the dogs (count 10). A.J. further testified to the identity of all but one of the dogs found in Bell's freezer as dogs that A.J. had helped Bell kennel before she saw Bell drown one of them (counts 6, 7, 8, and 9); Sasha, a favorite dog of A.J.'s, which Bell had claimed to have given away (count 5); a dog that had nipped A.J. and Bell, which Bell claimed to have killed by breaking its neck (count 11); a dog that A.J. had helped Bell load up into a cage, which Bell refused to give to A.J., stating that the dog would be going to another kennel (count 13); and the bitch that gave birth to the puppies that were injured after falling between the bars of the kennel (count 14). Although A.J. could not identify one of the dogs (count 12), investigators testified that the fur of this particular dog had significant ice buildup and appeared to have been wet prior to freezing.

While A.J. did not actually witness the drowning of the other dogs (counts 6, 7, 8, and 9), these dogs matched the description of the dogs A.J. helped Bell kennel and were found in the freezer along with the dog that A.J. did see Bell drown (count 10). This evidence supports the inference that Bell drowned all the dogs that A.J. had helped her kennel (counts 6, 7, 8, 9, and 10). Bell's statements that she had killed the dog that

8

nipped her and A.J. (count 11) along with A.J.'s identification of the dog's corpse in the freezer support the jury's finding of guilt on that count. Bell also told her employees that she had given away dogs that were later found dead in her freezer (counts 5 and 13). She lied to cover up what had happened, which can show consciousness of guilt. And relating to all counts, Bell initially told investigators that she had no idea what was in her freezer only to later state that any dogs that were in the freezer had been euthanized by her veterinarian because they were unadoptable. Bell's veterinarian, however, denied having euthanized any of the dogs found in the freezer. Accordingly, this evidence, considered as a whole and with due deference to the jury's credibility determinations, is sufficient to sustain the jury's guilty verdict on counts 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14.

Whether the circumstances justified Bell killing the puppies (counts 1, 2, and 4) and whether Bell caused the puppies unnecessary or unjustifiable pain or suffering were fact questions for the jury. The state offered evidence at trial suggesting that killing the puppies was unnecessary and unjustifiable. Bell drowned a puppy (count 4) in a bucket of water, stating that she thought the puppy was too small to live, and she was going to put it out of its misery. But J.I. testified that the puppy appeared healthy before Bell drowned it. "[W]eighing the credibility of witnesses is a function exclusively for the jury." *State v. Pippitt*, 645 N.W.2d 87, 94 (Minn. 2002).

Regarding the two injured puppies (counts 1 and 2), the Humane Society investigator testified that it is evident when a bitch is going to give birth to its litter and that, two weeks prior to birth, it is necessary for an owner to move the bitch from the general population to a warm, comfortable, and quiet location. This is done because the

9

puppies are small, blind, and helpless, and need to be secured near their mother such that they cannot fall between the bars of a kennel. The evidence was sufficient for the jury to find that Bell's failure to take these steps caused the puppies unnecessary or unjustifiable pain, suffering, or death.

Moreover, while the puppies had sustained serious injuries, A.J. testified that the puppies were alive, moving and making sounds. *Id.* at 94 ("[W]eighing the credibility of witnesses is a function exclusively for the jury."). But even assuming, as Bell argues, that killing the two injured puppies was necessary or justified, the state presented sufficient evidence for the jury to find that Bell caused the puppies unnecessary and unjustifiable pain or suffering by drowning them in a bucket of water. The veterinarian testified that Bell never consulted her about any puppies that were sick or the possibility of euthanizing any puppies. And the doctor testified that a dog would experience drowning similarly to a human and would suffer.

Viewing the evidence in the light most favorable to the verdict, the jury reasonably could have found that Bell caused the dogs and puppies unnecessary or unjustifiable pain, suffering, or death.

## II. Pet or Companion Animal

Bell argues that the state failed to prove the essential element that the dogs were pet or companion animals, as defined in Minn. Stat. § 343.20, subd. 6. We disagree.

If an appellant challenges the evidence on the ground that his or her conduct is not prohibited by the applicable statute, the appellant's argument raises an issue of statutory interpretation, to which this court applies a de novo standard of review. *State v. Colvin*,

10

645 N.W.2d 449, 452 (Minn. 2002). "We construe the words and phrases in a statute in accordance with their plain and ordinary meaning." *Johnson v. State*, 820 N.W.2d 24, 26 (Minn. App. 2012). "The primary objective for a court's interpretation of statutory language is to ascertain and give effect to the legislature's intent." *State v. Mauer*, 741 N.W.2d 107, 111 (Minn. 2007). "When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn. Stat. § 645.16 (2012). "[A]mbiguity exists only where a statute's language is subject to more than one reasonable interpretation." *Mauer*, 741 N.W.2d at 111. When legislative intent "is clearly discernible from plain and unambiguous language, statutory construction is neither necessary nor permitted." *State v. Kelbel*, 648 N.W.2d 690, 701 (Minn. 2002), *cert. denied*, 123 S. Ct. 1000 (2003). "A rule of strict construction applies to penal statutes, and all reasonable doubt concerning legislative intent should be resolved in favor of the defendant." *Colvin*, 645 N.W.2d at 452.

Under Minn. Stat. § 343.20, subd. 6, a pet or companion animal "includes any animal[1] owned, possessed by, cared for, or controlled by a person for the present or future enjoyment[2] of that person or another as a pet or companion, or any stray pet[3] or stray

---

[1] "'Animal' means every living creature except members of the human race." Minn. Stat. § 343.20, subd. 2 (2012).
[2] *Black's Law Dictionary* defines "enjoyment" as "[p]ossession and use, esp. of rights or property," *Black's Law Dictionary* 609 (9th ed. 2009), and *The American Heritage Dictionary* defines "enjoyment" as "[u]se or possession of something beneficial or pleasurable," *The American Heritage Dictionary* 611 (3d ed. 1992).
[3] The statute also includes "any stray pet or stray companion animal," indicating that the animal need not bear any indicia of ownership, possession, care, or control by a person

11

companion animal." The statute uses the terms "pet"[4] and "companion"[5] in its definition. *Id.*

Here, witnesses testified that the dogs at Bell's kennel were small-breed dogs, which were given names, the employees would pet the dogs, and they were spoken to in an affectionate manner. And when Bell sold dogs, the bill of sale indicated that "[t]his pet is being purchased and sold strictly as a companion/pet . . . ." As a result, the jury reasonably could have found that Bell, as a breeder of household dogs, owned, possessed, cared for, or controlled the dogs for her or another's present or future enjoyment as a pet or companion animal.

But Bell argues that the plain language of the statute modifies the term "enjoyment" such that the animal owned, possessed, cared for, or controlled, must be "for the present or future *enjoyment* of that person or another *as a pet or companion*," and any domesticated animal possessed for enjoyment in the purely economic sense is not a "pet or companion animal" under the statute. Minn. Stat. § 343.20, subd. 6 (emphasis added). In other words, Bell contends that, while some of her dogs may have been pet or companion animals, she had other dogs, such as breeding stock, which were never intended to be enjoyed as present or future pets either by her or another person. Bell also

for present or future enjoyment as a pet or companion. A stray pet is one that is "wandering or lost." *The American Heritage Dictionary* 1776 (3d ed. 1992); *see In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009) ("The word 'any' is broadly applied in statutes.") (citing *Olson v. Ford Motor Co.*, 558 N.W.2d 491, 494 (Minn. 1997)).

[4] "Pet" is defined as "[a]n animal kept for amusement or companionship." *The American Heritage Dictionary* 1353 (3d ed. 1992).

[5] "Companion" means "[a] person who accompanies or associates with another; a comrade." *The American Heritage Dictionary* 384 (3d ed. 1992).

12

claims that the three puppies were not going to be pets, two as a result of the injuries they sustained and the third because of its small size. Therefore, Bell asserts that, because the phrase "enjoyment . . . as a pet or companion" applies only to an animal kept for pleasure, Minn. Stat. § 343.20, subd. 6, the state failed to satisfy its burden of proof that any of the dogs identified at trial were pet or companion animals. Although creative, Bell's argument is ultimately unavailing; Minn. Stat. § 343.20, subd. 6, does not so narrowly restrict the universe of animals that qualify as pets or companion animals.

The statute's definition of a pet or companion animal is not exhaustive and "*includes* any animal owned, possessed by, cared for, or controlled by a person for the present or future enjoyment of that person or another as a pet or companion, or any stray pet or stray companion animal." Minn. Stat. § 343.20, subd. 6 (emphasis added); *cf.* Minn. Stat. § 343.20, subd. 7 (2010) (restricting definition of "service animal," which "*means* an animal trained to assist a person with a disability." (Emphasis added)). "[D]istinctions in [statutory] language in the same context are presumed to be intentional, and we apply the language consistent with that intent." *In re Stadsvold*, 754 N.W.2d 323, 328-29 (Minn. 2008).

This interpretation is buttressed by reference to the Pet and Companion Animal Welfare Act. Minn. Stat. §§ 346.35-.44 (2010). "The doctrine of *in pari materia* is a tool of statutory interpretation that allows two statutes with common purposes and subject matter to be construed together to determine the meaning of ambiguous statutory

13

language."[6] *State v. Lucas*, 589 N.W.2d 91, 94 (Minn. 1999); *see* Minn. Stat. § 645.16 (2012) (providing that "[w]hen the words of a law are not explicit, the intention of the legislature may be ascertained by considering . . . other laws upon the same or similar subjects").

The Pet and Companion Animal Welfare Act defines "[p]et" or "companion animal" to "*mean*[] a nonhuman mammal, bird, or reptile impounded or held for breeding, or possessed by, cared for, or controlled by a person for the present or future enjoyment of that person or another." Minn. Stat. § 346.36, subd. 6 (emphasis added). Both Minn. Stat. § 343.20 (2010), which governs cruelty to animals, and Minn. Stat § 346.36, which governs the welfare of pets and companion animals, share common purposes and subject matter. Reading these two statutes together, "[p]et or companion animal," as defined by Minn. Stat. § 343.20, subd. 6, unquestionably includes all of the dogs at Bell's kennel.

Under Bell's interpretation, so long as her subjective "enjoyment" of a dog at her kennel amounts to use of the animal as a vessel for conceiving, birthing, and rearing puppies that would be sold as pets, the breeding dog would not qualify as a "pet or companion animal" under Minn. Stat. § 343.20. We presume that the legislature does not intend results that are "absurd, impossible of execution, or unreasonable." Minn. Stat. § 645.17(1) (2012). Just as a farm cat that is kept in a barn to kill mice or a hunting dog that is used to retrieve game can still be a pet, some of Bell's dogs may have served

---

[6] Although legislative intent is discernible from a plain reading of Minn. Stat. § 343.20, subd. 6, rules of statutory construction are helpful to make that intent "*clearly discernible*." *Kelbel*, 648 N.W.2d at 701 (emphasis added).

14

incidental roles that imparted some economic benefit. But these animals continue to qualify as pet or companion animals under Minn. Stat. § 343.20, subd. 6. In every objective sense, the dogs and puppies that Bell "enjoyed" at her kennel were small-breed, household dogs raised to be and treated as domesticated pets, and Bell sold many of them as pets. Each of these dogs, colloquially referred to as "man's best friend," qualifies as a pet or companion animal under the non-exhaustive definition of Minn. Stat. § 343.20, subd. 6, which is sufficiently definite such that "ordinary people can understand what conduct is prohibited." *State v. Newstrom*, 371 N.W.2d 525, 528 (Minn. 1985) (quotation omitted).

### III. Prosecutorial Misconduct

Bell argues that "[t]he prosecutor committed three violations of basic and well-settled rules of which are fundamental to fairness and the violation of which deprived [Bell] of a fair trial." For objected-to prosecutorial-misconduct claims, this court applies one of two harmless-error standards. *State v. Watson*, 829 N.W.2d 626, 630 (Minn. App. 2013) (citing *State v. Caron*, 300 Minn. 123, 127-28, 218 N.W.2d 197, 200 (1974)), *review denied* (Minn. June 26, 2013). In cases involving less-serious prosecutorial misconduct, this court considers "whether the misconduct likely played a substantial part in influencing the jury to convict." *Caron*, 300 Minn. at 128, 218 N.W.2d at 200. In cases involving "unusually serious" misconduct, this court asks if it is certain beyond a reasonable doubt that the misconduct was harmless. *Id.* at 127, 218 N.W.2d at 200.

## A.     Other Bad Acts

Bell first contends that the prosecutor committed misconduct when she elicited statements from an employee of the U.S. Department of Agriculture's animal-care division, who testified that Bell admitted to wrapping an injured puppy in a wet rag and placing it in the freezer on advice from Bell's veterinarian.  Bell objected, arguing that the prosecutor had deliberately elicited other acts of misconduct that had not been charged, and moved for a mistrial.  The district court denied Bell's motion, reading a curative instruction to the jury that the USDA employee's statement about Bell wrapping a puppy in a wet rag and putting it in the freezer was to be disregarded.[7]

"Ordinarily, evidence of other crimes or prior bad acts of a defendant is not admissible to show behavior consistent with the character of that defendant." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007) (citing *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965)) (other citations omitted).  Such evidence, however, may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b).  In addition, prior misconduct, other than conviction of a crime, may be admissible for the purpose of attacking a witness's credibility if the prior misconduct is probative of untruthfulness.  Minn. R. Evid. 608(b).

The state argues that the purpose of the USDA employee's testimony about Bell wrapping a puppy in a wet rag and placing it in the freezer based on advice from her

---

[7] The district court, in its final instructions to the jury, also repeated this charge, advising that "[y]ou are to disregard all evidence I have ordered stricken or have told you to disregard."

veterinarian "was to show that the veterinarian ha[d] not advised [Bell] on other acceptable ways to euthanize dogs."  But the veterinarian had already testified, without objection from Bell, that she never indicated to Bell that it was proper to euthanize a puppy by wrapping it in a wet rag and putting it in the freezer.  The USDA employee's testimony on this matter had no bearing on whether Bell's veterinarian had, in fact, advised Bell on proper methods of euthanasia.

But even if the prosecutor's conduct in eliciting this testimony rises to the level of "unusually serious" misconduct, it is certain beyond a reasonable doubt that the misconduct was harmless.  *Caron*, 300 Minn. at 127, 218 N.W.2d at 200.  Any potential misconduct was mitigated by the bench conference and the district court's subsequent curative instruction that the jury disregard the testimony regarding the potentially prejudicial bad act.  *See State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005) (holding that a prosecutor's improper question was harmless because a curative instruction was given and the fairness of the trial was not impaired).  Further, the evidence of Bell's guilt of the charged conduct, as established by other witnesses, was strong.  And in this case, despite the potential misconduct, the jury found Bell not guilty on one of the 14 counts (count 3), suggesting that the fairness of the trial was not impaired.  *See State v. DeWald*, 463 N.W.2d 741, 745 (Minn. 1990) (explaining that a jury's acquittal of one count showed that the jury was not prejudicially influenced by prosecutorial misconduct).  Accordingly, any misconduct was harmless beyond a reasonable doubt.

17

## B.    Right to Silence

Second, Bell contends that the prosecutor committed misconduct by eliciting testimony from a police officer that referred to Bell's invocation of her right to remain silent.  In support of her claim, Bell points to the following exchange:

> [Officer]: She did say she had been bitten by a dog, yes.
>
> [Prosecutor:] But she said that she gave that dog away?
>
> [Officer:] Correct.
>
> [Prosecutor:] Who did she say she gave it to?
>
> [Officer:] I believe she stated it was a Julie Knox (phonetic)
>
> [Prosecutor:] And did she tell you where Julie Knox lives?
>
> [Officer:] We started to get into that conversation but at some point our conversation ended and she chose not to speak with us any more and I wasn't able to verify where that was but she did state that it was in Eau Claire, Wisconsin I think.

Bell did not object when this testimony was proffered but then shortly thereafter, during a break, alleged that the prosecutor had committed misconduct and moved for a mistrial. Because neither Bell's counsel, the prosecutor, nor the district court could recall specifically how the prosecutor had elicited testimony that referred to Bell's invocation of her right to remain silent, the district court denied Bell's motion.

"[I]t has long been recognized that a defendant's decision to exercise his constitutional rights to silence and to counsel may not be used against him at trial." *State v. Litzau*, 650 N.W.2d 177, 185 (Minn. 2002).  Such references are prohibited because a jury is "likely to infer from the testimony that [the] defendant was concealing his guilt." *Id.* (quotation omitted) (alteration in orginal).

18

But here, there is no indication that the prosecutor sought to call attention to Bell's invocation of her rights. *See State v. DeRosier*, 695 N.W.2d 97, 107 (Minn. 2005) (providing that indirect references to a defendant's failure to testify are prohibited if they manifest a prosecutor's intent to call attention to the defendant's failure to testify or if they are such that a jury would naturally understand them as a comment on the defendant's failure to testify). The reference to Bell's invocation of her right to remain silent was isolated; it consisted of only one sentence of the officer's testimony, which amounted to more than 50 transcribed pages. *See State v. Haynes*, 725 N.W.2d 524, 530 (Minn. 2007) (explaining that the isolated nature of alleged misconduct decreased the probability that it influenced the jury's verdict). Moreover, the jury's acquittal of Bell on one count suggests that the witness's improper reference did not influence the jury's verdict. *See DeWald*, 463 N.W.2d at 745 (explaining that a jury's acquittal of one count showed that the jury was not prejudicially influenced by misconduct). Even assuming that the prosecutor's conduct rose to the level of "unusually serious" misconduct, it is certain beyond a reasonable doubt that given such an oblique reference in over 50 pages of transcribed testimony and five days of trial, any potential misconduct was harmless. *Caron*, 300 Minn. at 127, 218 N.W.2d at 200.

## C.      Disparagement of Defense

Finally, Bell argues that the prosecutor committed misconduct during rebuttal by disparaging the defense. During closing argument, Bell's trial counsel argued, "[i]f you would have found hair in the pool that matches the DNA on the dogs, that would be

circumstantial evidence that provides only one inference, that [the] dog was in the pool. . . . But this is not that kind of a case." In rebuttal, the prosecutor argued,

> And I have to address this hair issue again. It's an issue of using it when the argument works for you.
> If, let's say that there had been hair taken and let's say that it matched the dog's, the response probably would have been, well, those dogs are on that property. That hair could have gotten in the pool –

Bell's counsel then objected, arguing that the prosecutor disparaged his defense and had committed prosecutorial misconduct. The district court overruled the objection, and the prosecutor concluded by explaining that there was dog hair everywhere.

"[P]rosecutors must avoid inflaming the jury's passions and prejudices against the defendant." *State v. Bailey*, 677 N.W.2d 380, 404 (Minn. 2004). Although a prosecutor may argue that a particular defense has no merit, a prosecutor "may not belittle the defense, either in the abstract or by suggesting that the defense was raised because it was the only defense that might succeed." *State v. Martin*, 773 N.W.2d 89, 108 (Minn. 2009) (citing *State v. Griese*, 565 N.W.2d 419, 428 (Minn. 1997)). "We have generally found prejudicial prosecutorial misconduct only in extreme circumstances, and not when a prosecutor's comments are merely likely to confuse." *State v. McDaniel*, 777 N.W.2d 739, 752 (Minn. 2010); *see, e.g.*, *State v. Porter*, 526 N.W.2d 359, 363-64 (Minn. 1995) (finding misconduct where the prosecutor told the jury that they would be "suckers" if they believed a defense witness and would need a sedative if they acquitted the defendant); *State v. Montjoy*, 366 N.W.2d 103, 108-09 (Minn. 1985) (concluding that

20

misconduct occurred when the prosecutor repeatedly asked the jury to teach the defendant a lesson and stated that a defendant's "rights end" when he commits a crime).

The prosecutor's comments here fall well short of disparaging Bell's defense. The prosecutor pointed out that, because there was dog hair everywhere from the sheer number of dogs at Bell's kennel, the presence or absence of a particular dog's hair in the pool did not bear on whether that particular dog had been in the pool. This comment merely questioned opposing counsel's substantive argument that the only inference to be drawn from a DNA match of a hair in the pool and one of the dead dogs was that the dog had been in the pool – a fact that, according to Bell, the state could not establish. A prosecutor's explanation for why the jury should reject the defense's presentation of a false dichotomy is not misconduct.

## IV.    Alternative Perpetrator

Bell argues that the district court "erred and violated the right to due process by restricting both the scope of cross-examination and closing argument based on an erroneous understanding of 'alternative perpetrator' evidence."

"Evidentiary rulings are within the sound discretion of the district court and we will not disturb those rulings on appeal absent a clear abuse of that discretion." *State v. Nissalke*, 801 N.W.2d 82, 99 (Minn. 2011) (quotation omitted). A defendant has the right to present a complete defense, including "the right to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged," but this right is not absolute. *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn. 2009). Before a defendant may introduce evidence tending to prove that a third party committed the

21

charged crime, the defendant must lay "a proper foundation for admission of such evidence by offering evidence that has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime." *Id.* at 590. "If the defendant fails to lay a proper foundation, the alternative perpetrator defense will not be permitted." *Id.*

Here, just before trial, Bell's counsel attempted to advance the theory that "anybody else could have done it." Because Bell's counsel had not given notice of an alternative perpetrator, had not identified an alternative perpetrator, or provided some evidence connecting the alternative perpetrator with the commission of a crime, the district court precluded any argument or mention of an alternative perpetrator. Bell's counsel then argued that he wanted to question the USDA employee about a statement Bell made to him that "my husband did it."

But "our task is to determine whether the evidence, not the assertions, contained in the proffer provides the required" foundation. *State v. Jenkins*, 782 N.W.2d 211, 228 (Minn. 2010), *cert. denied*, 131 S. Ct. 1533 (2011). Bell's bare assertions are not evidence and do not have an "inherent tendency" to connect Bell's husband or anyone else to the crimes. *See State v. Richardson*, 670 N.W.2d 267, 280 (Minn. 2003) (explaining a defendant should not "be allowed to throw strands of speculation on the wall and see if any of them will stick" (quotation omitted)); *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn. 1977) ("[E]vidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime."). The district court did not abuse its discretion in limiting the introduction of alternative-perpetrator evidence.

22

## V.    Jury Instructions

Bell argues that the district court's instruction to the jury on reasonable doubt was "faulty" and that the district court erred when it denied Bell's request for a rational-hypothesis instruction on circumstantial evidence.

District courts are allowed "considerable latitude" in the selection of language for the jury instructions. *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002). "[J]ury instructions must be viewed in their entirety to determine whether they fairly and adequately explained the law of the case." *State v. Flores*, 418 N.W.2d 150, 155 (Minn. 1988). The refusal to give a requested jury instruction lies within the discretion of the district court and will not be reversed absent an abuse of discretion. *State v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996). The focus of the analysis is on whether the refusal resulted in error. *State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn. 2001).

The district court's reasonable-doubt instruction mirrored the language of 10 *Minnesota Practice*, CRIMJIG 3.03 (2006):

> Proof beyond a reasonable doubt is such proof as ordinarily prudent men and women would act upon in their most important affairs. A reasonable doubt is a doubt based upon reason and common sense. It does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt.

Bell first argues that CRIMJIG 3.03 "makes no sense and cannot be applied" because "[t]he last two clauses in the same sentence contain two pronouns that have different antecedents." This claim is meritless. We have held that "[c]ourts are always safe in using the instruction of [CRIMJIG 3.03]," which, taken as a whole, sufficiently explains

23

to the jury the state's burden of proof. *State v. Sap*, 408 N.W.2d 638, 641 (Minn. App. 1987). Accordingly, the district court did not abuse its discretion by reading this instruction.

Second, Bell argues that the district court erred by denying Bell's request for a rational-hypothesis instruction on circumstantial evidence.[8] The district court read 10 *Minnesota Practice*, CRIMJIG 3.05 (2006), which provides:

> A fact may be proven by either direct or circumstantial evidence, or by both. The law does not prefer one form of evidence over the other.
>
> A fact is proven by direct evidence when, for example, it is proven by witnesses who testify to what they saw, heard, or experienced, or by physical evidence of the fact itself. A fact is proven by circumstantial evidence when its existence can be reasonably inferred from other facts proven in the case.

In *State v. Gassler,* the supreme court clarified that the "rational hypothesis" language should only be applied to test the sufficiency of the evidence to sustain a conviction on appeal. 505 N.W.2d 62, 68 (Minn. 1993). The *Gassler* court held that this test does not apply to jury instructions and that the instruction of CRIMJIG 3.05 was an appropriate instruction concerning circumstantial evidence. *Id.* (citing *State v. Turnipseed*, 297 N.W.2d 308, 312 (Minn. 1980)). As a result, the district court here did not abuse its

---

[8] In support of her argument that a rational-hypothesis instruction is needed, Bell cites *State v. Anderson*, 784 N.W.2d 320, 340 (Minn. 2010) (Meyer, J., concurring), in which Justice Meyer expressed her support for the rational-hypothesis instruction, in cases relying on circumstantial evidence, as "essential to avert undermining the presumption of innocence and to impress upon the jury the need to reach a state of certitude of the guilt of the accused."

discretion when it denied Bell's request for a rational-hypothesis instruction on circumstantial evidence.

## VI. Suppression of Identification

Finally, Bell argues that, because one of the police officers had informed A.J. that the dogs were drowned, the district court erred when it declined to suppress A.J.'s identification of the dogs, which Bell claims was inherently suggestive. Bell attempts to frame this issue as a violation of her right to due process. But due-process concerns are implicated when the pretrial identification of the *defendant* was impermissibly suggestive. *See, e.g.*, *State v. Ostrem*, 535 N.W.2d 916, 921 (Minn. 1995) ("Whether a pretrial identification procedure is unnecessarily suggestive turns on whether the defendant was unfairly singled out for identification."). These principles have no application in the pre-trial identification of evidence. Instead, Bell's claim challenges the foundational reliability of A.J.'s identification of the dogs. "The district court has broad discretion over the admissibility of evidence, and the standard of review for the adequacy of foundation with respect to the admission of evidence is abuse of discretion." *Turnage v. State*, 708 N.W.2d 535, 542 (Minn. 2006).

Here, based on her own experience working closely with the dogs, A.J. identified all but one of the dogs found in the freezer from photographs. The police officer's suggestion to A.J. about how these dogs may have died does not undermine the foundational reliability of A.J.'s identification of the dogs with which she had personally

dealt.[9] As a result, the district court did not abuse its discretion in admitting A.J.'s

identification of the dogs that were found in Bell's freezer.

**Affirmed.**

---

[9] Bell also cross-examined A.J. and the police officer who informed A.J. that the dogs had been drowned and argued that A.J.'s identification of the dogs was less credible because she was told the dogs were drowned before seeing the photos. But "[a]ssessment of witness credibility is a jury function." *State v. Reese*, 692 N.W.2d 736, 741 (Minn. 2005).