**STATE of Minnesota, Respondent,**

v.

**James Allen POST, Petitioner, Appellant.**

**No. C2–92–1351.**

Supreme Court of Minnesota.

Feb. 18, 1994.

Rehearing Denied March 28, 1994.

John Stuart, State Public Defender, Bradford S. Delapena, Sp. Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., William F. Klumpp, Jr., Asst. Atty. Gen., St. Paul, and Michael J. Thompson, Meeker County Atty., Litchfield, for respondent.

COYNE, Justice.

Defendant is a 30–year–old Minneapolitan with a master's degree in theater who was employed as a security guard. On the evening of September 6, 1991, he accompanied 17–year–old Eric Geislinger and 20–year–old Thomas Yost to a gunshop in Eden Valley. Yost, impatient to practice target shooting, asked defendant to buy a handgun because defendant had a permit to carry a gun and, therefore, was not subject to the seven-day waiting period.

After defendant had purchased the gun, Geislinger drove them to the Corner Bar in Eden Valley so that defendant could buy beer to take home. While the defendant was in the bar, Jeffrey Teicher drove by the parking lot where Geislinger and Yost were waiting. Thinking he had heard something, Teicher doubled back and confronted Geislinger and Yost. After Teicher and Geislinger exchanged insults, Teicher drove off.

When the defendant returned, Geislinger drove south on Highway 22, then turned east on Highway 55. Teicher closely followed the Geislinger car and, according to the occupants of the Geislinger car and one of Teicher's passengers (who contradicted Teicher's testimony) began flashing his high-beam headlights. Teicher's other passenger, his girlfriend, said Teicher put his high-beams on and left them on. After this conduct had continued while they traveled several miles, defendant told Geislinger to pull over so that Teicher could pass. Instead, Teicher pulled up behind Geislinger's car.

Defendant, who is 5 feet 6 inches tall and weighs about 150 pounds, thrust a loaded 9 millimeter semi-automatic handgun into his belt holster (the gun was not the one purchased that evening) and left the car to meet Teicher between the two cars. Defendant testified that he showed Teicher his security guard identification, said he was a private security guard and that he could arrange to have Teicher, who obviously had been drinking, arrested for DWI and harassment. Teicher, who weighs approximately 100 pounds more than defendant, slapped the card from defendant's hand. At some point—either then or during a subsequent struggle, if there was a subsequent struggle—defendant's watch came loose and fell off.

There is a conflict in the evidence about what happened after Teicher slapped the identification card away. Defendant claimed that he reasonably believed Teicher pulled a knife; defendant testified that it was in response to that and to Teicher's lunging at him that he pulled out the gun. He testified that he fired three shots, the first, intended as a warning shot into the ground, grazed Teicher's knee; the second, aimed at Teicher's lower leg struck Teicher in the hip, and a third shot, discharged when the two men struggled for the gun, hit Teicher in the abdomen. There was testimony that Teicher might have died had he not received prompt medical attention.

It is undisputed that defendant hopped into the car and fled with the others immediately after the shooting.

Defendant's attorney has raised three main issues on appeal relating to the fairness of the trial and also has raised a sentencing issue. He concedes that the evidence was sufficient to establish lack of justification and that therefore defendant is not entitled to an outright reversal of his conviction on that ground. He argues, however, that we should engage in a "weight" of the evidence analysis rather than a "sufficiency" of the evidence analysis and on that basis should grant defendant a new trial. He also seeks a new trial on the ground that the trial court erred in excluding testimony by one of the people in Teicher's car that Teicher was the "aggressor" in the confrontation and erred in permitting the prosecutor, Michael Thompson, to present evidence relating to the standards taught defendant by his employer, the security guard company, when he received his training in the use of a firearm.

■ We first address defendant's claim that the trial court prejudicially erred in striking and then directing the jury not to consider testimony by one of Teicher's passengers that Teicher was the "aggressor."

■ We upheld the admission of analogous testimony *by a state's witness* (that the defendant in that case was not defending himself against an attack when he stabbed the victim) in *State v. Salazar,* 289 N.W.2d 753 (Minn.1980). The defendant in that case contended that the testimony was admitted in violation of Minn.R.Evid. 701, which provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Under this rule the emphasis is not on how a witness expresses himself or herself—*i.e.,* whether in the form of an opinion or a conclusion—but on whether the witness personally knows what he or she is talking about and whether the testimony will be helpful to the jury. 3 J. Weinstein, *Evidence—United States Rules* § 701[02] (1992). Minn.R.Evid. 704 specifically provides that "[t]estimony in

the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." In *Salazar*, the witness would not have been permitted to opine that the defendant did or did not act in self-defense within the legal test of self-defense, because an opinion of that nature would not be of use to the jury. *See* Advisory Committee Comment to R. 704. However, the witness was not asked to give a legal opinion; rather, she was simply asked whether the defendant in that case was defending himself against an attack when he stabbed the other person. The word "defending," as used in the prosecutor's question, was used in the sense that a lay person would use it, not to elicit a legal opinion but merely to elicit testimony as to what the witness saw. We dealt with the issue in this way:

> Defendant's contention that the trial court erred in permitting the prosecutor to ask one of the two key witnesses whether defendant was defending himself against an attack when he stabbed the victim has no merit, since the purpose of the prosecutor's question was not to elicit a legal opinion on the issue of self defense—which would not have been helpful to the jury— but simply to elicit testimony as to whether the witness saw the victim do anything which prompted defendant to stab him. *See* R. 701 and 704, R.Evid.

289 N.W.2d at 755.

In this case the shoe was on the other foot; not only was it the defendant who elicited such testimony from a witness allied with the injured party, not with the defendant, but here the trial court sustained the state's objection and then directed the jury to disregard the testimony. The court of appeals, without discussing *Salazar*, concluded that the trial court did not abuse its discretion in ruling as it did. The court of appeals added that if there was error it was harmless error.

---

1. *Schneble v. Florida*, 405 U.S. 427, 431–32, 92 S.Ct. 1056, 1059–60, 31 L.Ed.2d 340 (1972); *State v. Robinson*, 427 N.W.2d 217, 224 (Minn. 1988).

2. It is when dealing with a claim of erroneous *admission* of evidence that the question is whether there is a reasonable possibility that the

■ We believe that under *Salazar* it was error for the trial court to exclude the evidence. We also disagree with the court of appeals' analysis of the impact of that error. Harmless error impact analysis applies to the erroneous exclusion of defense evidence in violation of the defendant's right to present evidence, *Crane v. Kentucky*, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986), but the appropriate test is not whether the exclusion of the evidence "substantially influenced the jury to convict." The correct inquiry is that set forth in *Delaware v. Van Arsdall*, 475 U.S. 673, 683–84, 106 S.Ct. 1431, 1437–38, 89 L.Ed.2d 674 (1986): whether, "assuming that the damaging potential of the [excluded evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684, 106 S.Ct. at 1438. In other words, the reviewing court must be satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (*i.e.*, a reasonable jury)[1] would have reached the same verdict. Only then can it be said that the erroneous exclusion of the evidence was harmless. If, on the other hand, there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial.[2]

We need not decide whether the exclusion of the evidence in question by itself would warrant an award of a new trial, because we believe that the trial court committed other error and that the cumulative effect of these errors was to deprive defendant of a fair trial.

■ The other claim of error relied upon by defendant is that the trial court erred in admitting evidence of the defendant's employer's standards for the use of a firearm by a security guard.

wrongfully admitted evidence significantly affected the verdict; to put it another way, if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted, then the error in admitting the evidence was prejudicial error.

Defendant focuses his objection to the employer's manual on the manual's guidelines for handling a handgun. The manual sets out these rules: do not remove the weapon to threaten anyone; "NEVER fire a warning shot"; always point the gun in a safe direction; do not touch the trigger until ready to fire; keep the weapon unloaded while off-duty; know how it operates; understand the proper ammunition; "NEVER mix alcohol or drugs when carrying a weapon"; and always handle it as if it were loaded. The manual also states "NEVER point a weapon at anyone you do not intend to shoot or in any direction where an accidental discharge may do harm."

Defendant argues that "[b]ecause the privilege of self-defense depends on whether the decision to use force is reasonable, not on whether justifiable force is used in a careful manner, the trial court abused its discretion and confused the jury" by admitting the manual. He contends that the manual was irrelevant and prejudicial because it "injected a negligence-style standard of care" which could mislead the jury in evaluating his self-defense claim.

The state counters by arguing that whether defendant was trained in the use of deadly force and what he was told bear on the issue of defendant's intent.

We conclude that the trial court erred in admitting the manual and allowing its use in cross-examining defendant. For example, as a result of the trial court's ruling, the jury learned that defendant had been instructed never to fire a warning shot and that his firing a warning shot violated the standards in the manual. However, those standards rather obviously were designed to guard against the employer's potential civil liability for the discharge of a firearm by one of the employer's guards. The standards are not standards for determining if a criminal defendant acted reasonably in shooting someone during a nighttime confrontation out on a highway, and their introduction tended to divert the jury's attention from the issues before it. Indeed, without the evidence that it was a violation of "standards" to fire a warning shot, the jury might well have been inclined to view the firing of a warning shot

as evidence of a reasonable, gradually increasing use of force by defendant to meet a perceived threat to his own safety.

As Justice Rogosheske said in *State v. Peterson,* 266 Minn. 77, 83, 123 N.W.2d 177, 182 (1963), an appellate court has a "responsibility to review the record even though assignments of error are inadequate." *See also* Allan D. Vestal, *Sua Sponte Consideration in Appellate Review,* 27 Fordham L.Rev. 477, 508–12 (1959).

■ In our review of the record in this case we noted (a) that defendant's attorney at trial sought and was denied permission to cross-examine Teicher about his prior felony conviction of criminal damage to property and (b) that in closing argument the prosecutor said:

Now, I ask you, at the conclusion of your deliberations, that you preserve the integrity of our society and keep us from having to worry about when we're going to face the next individual with a gun in his hand and when he's going to decide to use it on us.

(a) While we need not decide whether the trial court abused its discretion in denying defendant permission to use Teicher's prior conviction to impeach his credibility as a witness, on retrial the trial court may want to reconsider this ruling, given the importance of the issue of the relative credibility of Teicher and defendant.

■ (b) The above-quoted statement by the prosecutor, although not objected to, was improper. *See State v. Salitros,* 499 N.W.2d 815, 819–20 (Minn.1993), where we awarded a new trial to a criminal defendant because the prosecutor's closing statement included a number of improper arguments, one of them similar to this argument. On retrial the prosecutor is cautioned against repeating such an argument. The jury's role, as we said in *Salitros,* "is not to enforce the law or teach defendants lessons or make statements to the public or to 'let the word go forth'; its role is limited to deciding dispassionately whether the state has met its burden in the case at hand of proving the defendant guilty beyond a reasonable doubt." *Id.* at 819.

■■■■■■■■■■■■■■■■

■ In conclusion, we believe that the cumulative effect of the evidentiary errors discussed earlier in this opinion was that defendant was deprived of a fair trial. We need not address or decide whether the state's evidence was insufficient to establish intent to kill or lack of justification in order to reach this conclusion. Suffice it to say, the state's evidence on intent to kill and on the issue of whether defendant acted unjustifiably was sufficiently weak that different rulings by the trial court might well have resulted in different verdicts both on the charge of attempted murder and on the assault charges. Since there is a reasonable possibility that the result in this case might have been different if the trial court had not erred in making the rulings in question, we hold that the error was prejudicial.

Reversed and remanded for new trial.

TOMLJANOVICH, Justice (dissenting in part and concurring in part).

I believe the trial court acted within its discretion in excluding a witness's lay opinion that the victim was the aggressor; therefore, I dissent from that portion of the opinion.

Rulings on evidentiary matters rest within the sound discretion of the trial court. *State v. Olkon*, 299 N.W.2d 89, 101 (Minn.1980). Clearly the trial judge could have admitted the opinion testimony if he had found that the opinion was rationally based on the perception of the witness and was helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. Minn.R.Evid. 701. Rule 701 does not mandate the admission of lay opinion testimony, especially as in this case where the witness admitted he was drunk, that his view of the incident was partially obstructed, and told the jury that he "can't recall" some of the actions that night. The trial judge, no doubt, weighed those factors in determining whether the opinion was rationally based on the perception of the witness. The trial judge is in the best position to make that determination; therefore, I dissent in part.