OPINION
ANDERSON, Justice.
A jury found David Muniz Bustos guilty of first-degree murder while committing domestic abuse, Minn.Stat. § 609.185(a)(6) (2014), second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2014), second-degree felony murder, Minn.Stat. § 609.19, subd. 2(1) (2014), and third-degree murder, Minn.Stat. § 609.195(a) (2014). In this direct appeal, Bustos seeks a new trial on the first-degree domestic-abuse murder charge, arguing that the district court committed reversible error when it instructed the jury on the law and when it limited defense counsel’s closing argument. Bustos also argues that he is entitled to a new trial on the charge of second-degree intentional murder because the district court committed reversible error when it excluded relevant and material evidence.
We reverse Bustos’s first-degree murder conviction and remand for a new trial on that charge because the district court committed multiple plain errors that, tak *658 en cumulatively, seriously affected the fairness, integrity and public reputation of the judicial proceedings. We also conclude that any alleged error based on the exclusion of Bustos’s preliminary breath . test results was harmless beyond a reasonable doubt.
In 2011, Bustos and Dominga Limón began a romantic relationship that, by February 2012, • had lasted for eight months. During part of that period, Bus-tos and Limón lived together in Silver Lake. After Limón moved to Glencoe to start a new job, the couple continued to date. On the night of the murder, February 21, 2012, Bustos went to Limon’s apartment around 7:00 p.m. Prior to arriving, Bustos drank 18 cans of beer. The record is not clear on when Bustos consumed the beer, but Bustos testified on cross-examination that he had “drunk the beer in the morning, and then by the evening, I had already had some food and everything, so I wasn’t ... drunk.” Li-món left the apartment around 9:00 p.m. to meet her daughter, who was planning to stay at Limon’s apartment. While Limón was away, Bustos drank shots of vodka.
After Limón and her daughter returned to the apartment, Limón prepared for work. Limón asked her daughter to hide the alcohol from Bustos because he was intoxicated. Limon’s daughter overheard Limón and Bustos arguing. During the argument, Bustos accused Limón of preparing to see her new boyfriend rather than preparing for work. Limón told Bus-tos that he could either sleep until he was sober or leave right away.
Limon’s daughter went outside to retrieve the rest of her belongings from her car and send a text message to her boyfriend. She was outside the apartment for approximately 10 minutes when she heard her mother yelling for her. As she went inside, she looked through the window and believed she saw Bustos striking her mother. Limon’s daughter ran inside and forced Bustos to leave the apartment by hitting him with her keys and throwing a pan at him. She called 911 as Bustos left the apartment.
After leaving the apartment, Bustos walked up and down the street in front of the apartment, yelling that he was part of a gang and that he was not afraid of the police. When Limon’s daughter returned to the apartment, Limón was lying on the floor, surrounded by blood. The police arrived shortly after the emergency call and observed Bustos running in the street near the apartment. Bustos first ran toward the police; then he stopped and ran in the opposite direction. The police reached Bustos and handcuffed him. One arresting officer testified that Bustos smelled “very heavily of alcohol.” The other arresting officer testified that Bus-tos’s speech was very slurred and his balance was staggered. The officers took Bustos into custody.
One of the responding officers entered the apartment, where she saw Limón on the living-room floor surrounded by blood and vomit. Limón had seven stab wounds to her chest and left arm along with three stab wounds to her right hand. Limón told the paramedics that Bustos had stabbed her with a knife. An officer later recovered a bloody knife from underneath an entertainment center in the living room. After Limón arrived at the emergency room, she was airlifted to Hennepin County Medical Center, where she died from a lack of oxygen to her brain due to blood loss caused by the multiple stab wounds.
Bustos, who became increasingly uncooperative at the jail, was placed in a holding cell because of his conduct. Several officers observed that Bustos appeared intoxicated at the time of his arrest. Around 7:30 a.m. the following morning, *659 the police chief met with Bustos to take his statement. Because the police chief believed Bustos was still impaired, the police chief had a preliminary breath test (PBT) administered. The PBT registered an alcohol concentration of .153. The police chief decided not to take Bustos’s statement at that time. Instead, Bustos’s .statement was taken approximately 12 hours later, at around 7:00 p.m. Bustos stated that he did not remember anything except waking up, seeing Limón lying on the floor, and running away.
A grand jury indicted Bustos for first-degree murder while committing domestic abuse and second-degree intentional murder. A jury trial followed. At the beginning of the trial, Bustos moved to admit the results of the PBT. The district court denied the motion because Minn.Stat. § 169A.41, subd. 2 (2014), prohibited the test from being admitted as evidence and, alternatively, because the PBT lacked evi-dentiary foundation.
At trial, the State introduced evidence of seven incidents of domestic abuse by Bustos against four different people. Two of the alleged offenses were against Li-món. On February 19, 2012, just two days before the murder, Limón placed an emergency call while riding in a car with Bustos. The recording of the call was introduced as evidence during the trial. Li-món stated during the call that Bustos was threatening her and she was afraid Bustos would harm her. The second alleged incident of domestic abuse committed against Limón was introduced through Limon’s daughter, who testified that on the night Limón was murdered, Limón yelled at Bustos, “Are you going to hit me again like you did previously, the other day?”
The State also alleged five incidents of alleged domestic abuse committed by Bus-tos against his daughters and estranged wife. The first incident occurred in 2002 when Bustos and his estranged wife argued and Bustos threw a phone at her face. Bustos’s estranged wife also testified that in 2005 she and Bustos argued about a van, and during the argument, he pushed her. Bustos’s daughter testified that in 2006 her father became very angry with her when she told him that she was pregnant; during the ride home, Bustos repeatedly hit a window with a box cutter in a manner that frightened her, and when they arrived home, Bustos pushed her into the house. When Bustos’s other daughter called the police, Bustos raised his fist as if he was going to strike her. The final incident occurred at a family gathering in 2010. Bustos grabbed a banana and threw it at his estranged wife. She told him to leave her alone and threw it back at him. Bustos became angry and grabbed her by the neck. She testified that she was scared because everyone else ivas scared. Bustos’s daughter testified that Bustos was holding a knife by his side during the incident.
Before closing arguments, the district court advised defense counsel that he could not argue that the State was required to prove any alleged incident of prior domestic abuse beyond a reasonable doubt. However, defense counsel was allowed to argue that a pattern requires more than one incident, and that the State was required to prove a pattern of domestic abuse beyond a reasonable doubt.
The district court gave the following instructions to the jury regarding first-degree murder while committing domestic abuse:
Definition: The statutes of Miinnesota provide that whoever causes the death of a human being while committing domestic abuse, when the defendant has engaged in a past pattern of domestic abuse upon the decedent or upon another family or household member and the *660 decedent’s death occurs under circumstances manifesting an extreme indifference to human life, is guilty of a crime.
The Elements of Murder in the First Degree While Committing Domestic Abuse are:
First....
Second, the injury causing the death of Dominga Limón occurred while the defendant was committing domestic abuse. Minnesota Statutes define “domestic abuse” as an act amounting to assault, domestic assault, criminal sexual conduct, terroristic threats, or similar acts if committed against a family or household member.
Third, the defendant engaged in a past pattern of domestic abuse upon Do-minga Limón or upon another family or household member. A “past pattern of domestic abuse” means prior acts of domestic abuse that form a reliable sample of observable traits or acts which characterize an individual’s behavior. More than one prior act of domestic abuse is required for there to be a past pattern.
Fourth....
Fifth....
If you find that each of these five elements has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.
The jury returned a guilty verdict on each charged offense. The district court adjudicated Bustos guilty of first-degree domestic-abuse murder and sentenced him to life in prison with the possibility of release. The district court did not enter convictions on the other counts. Bustos now appeals.
I.
Bustos claims he is entitled to a new trial on the first-degree domestic-abuse murder conviction. He asserts two errors on appeal with respect to that charge. First, he argues that the district court' erred by restricting defense counsel’s closing argument regarding the State’s burden of proof on the “past pattern of domestic abuse” element. Second, he argues that the district court’s jury instructions improperly broadened the definition of “domestic abuse.” We examine each alleged error in turn, and then determine whether the errors affected Bustos’s substantial rights.
A.
First, Bustos asserts that the district court erred by depriving defense counsel of the opportunity to argue that the State failed to prove at least two prior incidents of domestic abuse beyond a reasonable doubt, which is required for a domestic-abuse murder conviction under Minn.Stat. § 609.185(a)(6). See State v. Johnson, 773 N.W.2d 81, 86 (Minn.2009). Although it is not entirely clear whether Bustos objected at trial to the restriction placed on closing argument, based on our review of the record we conclude that he did not.[1] Because Bustos did not object at trial, he must establish that there was an error, the error was plain, and the error affected his substantial rights. State v. Griller, 588 N.W.2d 736, 740 (Minn.1998). “An error is plain if it is clear or obvious; *661 usually this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct.” State v. Vang, 847 N.W.2d 248, 261 (Minn.2014).
Each element of the crime of domestic-abuse murder must be proven beyond a reasonable doubt, State v. Cross, 577 N.W.2d 721, 727 (Minn.1998), including the element of a past pattern of domestic abuse upon the victim or upon another family or household member. See Minn. Stat. § 609.185(a)(6). For purposes of section 609.185(a)(6), we have defined the phrase “past pattern” as conduct consisting of two or more prior acts that are proximate in time to each other and reflect “a regular way of acting.” State v. Hayes, 831 N.W.2d 546, 554-55 (Minn.2013); see State v. Sanchez-Diaz, 683 N.W.2d 824, 834 (Minn.2004). The State therefore must prove beyond a reasonable doubt that the defendant engaged in conduct that involved more than one prior act, reflected “a regular way of acting,” and was proximate in time.
But when the State alleges prior acts in excess of what is necessary to prove a past pattern, not all of the prior acts need to be proven beyond a reasonable doubt because no one predicate act is an element of the offense.[2] Johnson, 773 N.W.2d at 86-87; State v. Kelbel, 648 N.W.2d 690, 699-700 (Minn.2002); Cross, 577 N.W.2d at 727 (concluding that the State does not have to prove each underlying act of domestic abuse beyond a reasonable doubt, as long as the jury finds that at least two of the underlying acts were proven). In describing this principle, we have said that “if the state presents evidence of underlying acts A, B, C, and D, it is not reversible error for there to be insufficient evidence of D, if A, B, and C are sufficient to establish a pattern of domestic abuse beyond a reasonable doubt.” Kelbel, 648 N.W.2d at 699-700. But it does not follow from this principle that the State can prove a pattern beyond a reasonable doubt without proving any prior act beyond a reasonable doubt. Johnson, 773 N.W.2d at 87.
We acknowledge that this is a complicated area of law, but we conclude that the district court misinterpreted our precedent during Bustos’s trial, when it told defense counsel that he could not argue to the jury during closing argument that “the State is required to prove any alleged incident of prior domestic abuse ... beyond a reasonable doubt....” The error is illustrated by the example used in Kelbel that assumed the State presented evidence of underlying acts A, B, C, and D. As noted above, although it would be improper for defense counsel to argue that the jury should acquit the defendant simply because the State failed to prove D beyond a reasonable doubt, it would not be improper for defense counsel to argue that the jury should acquit the defendant if the State failed to prove A, B, C, and D beyond a reasonable doubt. The State cannot prove a pattern beyond a reasonable doubt if it proves none of the prior acts beyond a reasonable doubt. See Johnson, 773 N.W.2d at 86-87. Defense counsel therefore must be allowed to argue that an acquittal is appropriate if the State fails to prove any of the prior incidents beyond a reasonable doubt.[3]
*662 We conclude that the district court’s restriction on defense counsel’s closing argument contradicted well-established case law and constituted plain error.[4] We need not determine if this error, standing alone, affected Bustos’s substantial rights because the effect of this error and another error discussed in the following section, taken together, warrant a new trial. See State v. Keeton, 589 N.W.2d 85, 88 (Minn.1998).
B.
Bustos also argues that the district court committed reversible error by defining domestic abuse in the jury instructions more broadly than its statutory definition in Minn.Stat. § 609.185(e) (2014).[5] Because Bustos did not object to the jury instruction at the district court, we again review for plain error. Griller, 583 N.W.2d at 740. Minnesota Statutes § 609.185(e) provides:
“[Djomestic abuse” means an act that:
(1) constitutes a violation of section 609.221, 609.222, 609.228, 609.224, 609.2242, 609.342, 609.343, 609.344, 609.345, 609.713, or any similar laws of the United States or any other state and
(2) is committed against the victim who is a family or household member as defined in section 518B.01, subdivision 2, paragraph (b).
(emphasis added). Bustos argues that the district court misstated the law when it instructed the jury that the “Minnesota statutes define ‘domestic abuse’ as an act amounting to assault, domestic assault, criminal sexual conduct, terroristic threats, or similar acts if committed against a family or household member” (emphasis added). Bustos asserts that this instruction is inconsistent with the statutory language because the district court conveyed that any act similar to domestic abuse, such as a family argument, constitutes domestic abuse.
We agree with Bustos that the district court committed plain error when it instructed the jury that domestic abuse includes other “similar acts,” given that Minn.Stat. § 609.185(e) includes only the enumerated Minnesota crimes and violations of “any similar laws of the United *663 States or any other state.” The “similar laws” language in the statute does not include “similar acts,” as the district court’s instruction stated. Rather, it includes -only “similar” federal crimes, or crimes of other states. Thus, by including the “similar acts” language, the district court erroneously expanded the definition of domestic abuse. The jury could have reasonably, and incorrectly, believed the definition of domestic abuse includes other Minnesota crimes that are similar to the crimes listed or, even more troubling, noncriminal acts that are similar to the crimes listed.
Because the definition of domestic abuse in Minn.Stat. § 609.185(e) includes only the enumerated Minnesota crimes and “similar” federal crimes or crimes committed in other states, the definition of domestic abuse given in the jury instruction encompasses a substantially larger range of conduct than the actual statutory definition of domestic abuse. The jury instruction on the definition of “domestic abuse” was therefore plainly erroneous.
C.
Next, we determine whether the restriction on defense counsel’s closing argument and the improper definition of domestic abuse in the jury instruction, taken cumulatively, affected Bustos’s substantial rights. Griller, 583 N.W.2d at 740; see State v. Mayhorn, 720 N.W.2d 776, 792 (Minn.2006) (Anderson, G. Barry, J., dissenting) (stating that cumulative plain error must satisfy the Griller test). Plain error affects a defendant’s substantial rights if “there is a reasonable likelihood that the error[s] had a significant effect on the jury’s verdict.” Vang, 847 N.W.2d at 261.
Both errors related to the jury’s determination of the same element: whether Bustos engaged in a past pattern of domestic abuse. The restriction on closing argument deprived defense counsel of the opportunity to argue that the State failed to prove at least two prior incidents of domestic abuse beyond a reasonable doubt, and the improper definition of “domestic abuse” erroneously broadened the scope of predicate offenses that satisfy the element.[6] Further, the record does not contain overwhelming evidence of a pattern of domestic abuse and Bustos contested the existence of a pattern of domestic abuse at trial. It is reasonably likely that these errors, taken cumulatively, had a significant effect on the verdict, and therefore the errors affected Bustos’s substantial rights.
II.
Having concluded that Bustos has established plain errors affecting his substantial rights, we must consider whether Bustos is entitled to a new trial. A plain error affecting substantial rights warrants reversal only if the error must be addressed to ensure the fairness, integrity, or public reputation of the judicial proceedings. Griller, 583 N.W.2d at 742. Put differently, plain errors affecting Bustos’s substantial rights, without more, are insufficient to warrant a new trial. United *664 States v. Olano, 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
Prohibiting counsel from arguing that the State has failed in its essential duty to prove a defendant’s guilt beyond a reasonable doubt is no ordinary error. The roots of the beyond-a-reasonable-doubt standard are founded on an effort to reduce the risk of an erroneous conviction. James Q. Whitman, The Origins of Reasonable Doubt 6 (2008). In particular, according to Whitman, jurors in the medieval and early modern times worried that falsely convicting an innocent man, especially of crimes involving the standard pre-nineteenth-cen-tury punishments of execution or mutilation, was a mortal sin that put them at risk of damnation. Id. But, regardless of the origin of the requirement, by the 1700s it was commonly held that “[a] judge who is in doubt must refuse to judge.” Id. at 4. Our nation’s history includes a well-known example of this principle. John Adams, defending British soldiers before a colonial jury in 1770, argued to the jury during the Boston Massacre trials, “Where you are doubtful never act: that is, if you doubt of the prisoner’s guilt, never declare him guilty; that is always the rule, especially in cases of life.” Id. at 4, 216 & n. 19. This requirement became commonly expressed as proof beyond a reasonable doubt.
Thus, the beyond-a-reasonable-doubt standard, rooted in a fear of erroneous convictions, “has characterized the Anglo-American criminal justice system for more than two hundred years.” Barbara J. Shapiro, “Beyond Reasonable Doubt” and “Probable Cause ” 1 (1991). As the Supreme Court has explained:
The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence — that bedrock “axiomatic and elementary” principle whose “enforcement lies at the foundation of the administration of our criminal law.”
In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)). The Court has also acknowledged:
There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. ... To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude' of the facts in issue.
Id. at 364, 90 S.Ct. 1068 (internal quotation marks omitted). By restricting defense counsel’s use of the indispensable reasonable-doubt standard, the district court increased the risk of erroneous conviction. See State v. Baird, 654 N.W.2d 105, 114 (Minn.2002).
This erroneous restriction was particularly serious because, as the Supreme Court has noted:
It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For. it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries’ positions. And for the defense, dosing argument is the last dear diance to persuade the trier of fact that there may be reasonable doubt of the defendant’s guilt.
Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (empha *665 sis added). The Supreme Court has also labeled the closing argument the most important aspect of partisan advocacy, explaining that “[i]n a criminal trial, which is in the end basically a factfinding process, no aspect of [ ] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.” Id.
The improper jury instruction magnified the deleterious effect of the impermissible restriction on closing argument. Jury instructions also guard against erroneous convictions by ensuring that the State establishes each element of a crime beyond a reasonable doubt. See State v. Williams, 324 N.W.2d 154, 160 (Minn.1982). When faced with an improper instruction and an improper restraint on vigorous advocacy regarding the State’s burden of proof, a jury is ill equipped to determine whether the State met the burden of proving an offense beyond a reasonable doubt. See State v. Vance, 734 N.W.2d 650, 661-62 (Minn.2007) (remanding for new trial after jury instruction misstated intent element); cf. Rose v. Clark, 478 U.S. 570, 594, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (Blackmun, J., dissenting) (“The erroneous instruction invites the jury to abdicate its constitutional responsibility to decide for itself whether the State has proved every element of the offense beyond a reasonable doubt.”).
The district court committed multiple plain errors that disarmed defense counsel of an indispensable tool during a critical stage of the proceedings and broadened the definition of an element of the offense to include noncriminal conduct. We conclude that a failure to correct the erroneous limitation on defense counsel’s final argument during Bustos’s trial, in combination with the improper jury instruction on the definition of domestic abuse, seriously affected the fairness, integrity or public reputation of the judicial proceedings.[7] Therefore, we reverse Bustos’s conviction of first-degree domestic-abuse murder and grant him a new trial on that charge.
We reiterate, however, that we do not decide here whether either error by itself requires a new trial. See State v. Underwood, 281 N.W.2d 337, 344 (Minn.1979). Instead, because of the interrelatedness and serious nature of the errors here, a new trial is necessary to ensure fundamental fairness.
III.
Because we reverse the first-degree murder conviction, it is also necessary to address Bustos’s challenge to the guilty verdict in connection with the second-degree murder charge. In addition to first-degree domestic-abuse murder, Bustos was charged with second-degree intentional murder in connection with Limon’s death, and he raised the defense of voluntary intoxication. Bustos argues that the *666 district court violated his right to present the defense of voluntary intoxication and prejudiced his case by excluding evidence of a preliminary breath test (PBT) that showed that Bustos had a .153 blood-alcohol level 8 hours after the stabbing.
We will not reverse a district court’s evidentiary ruling absent a clear abuse of discretion. State v. Medal-Mendoza, 718 N.W.2d 910, 916 (Minn.2006); see also State v. Henderson, 620 N.W.2d 688, 698 (Minn.2001) (“[W]hen a defendant alleges that his inability to present a defense violates his constitutional rights, evi-dentiary questions are reviewed for abuse of discretion.”). Bustos has the burden of establishing that the district court abused its discretion and that Bustos was prejudiced by the error. State v. Nunn, 561 N.W.2d 902, 907 (Minn.1997). Under an abuse-of-discretion standard, we may reverse the district court when the district court’s ruling “is based on an erroneous view of the law or is against logic and the facts in the record.” Riley v. State, 792 N.W.2d 831, 833 (Minn.2011).
The district court, gave two alternative reasons for excluding the PBT results. One was that under State v. Dille, 258 N.W.2d 565 (Minn.1977), there was no foundation guaranteeing the reliability of the PBT, so “the test result is not probative as a measurement and, hence, irrelevant.” The court alternatively determined that Minn.Stat. § 169A.41, subd. 2, applied to exclude the PBT results.[8]
It is unnecessary to decide whether the district court abused its discretion in excluding the PBT results, because even if the district court did abuse its discretion by excluding the evidence, the error was harmless and does not warrant reversal. See State v. Post, 512 N.W.2d 99, 102 (Minn.1994). We have articulated two standards of harmless-error review depending on whether the error implicates a constitutional right. See State v. Juarez, 572 N.W.2d 286, 291-92 (Minn.1997). Because Bustos is not entitled to relief under the more stringent constitutional standard, it is unnecessary to decide which standard applies here.
Even assuming the district court committed constitutional error when it excluded evidence of Bustos’s PBT, reversal is -not warranted if the error was “harmless beyond a reasonable doubt.” Post, 512 N.W.2d at 102. We determine whether an error is harmless beyond a reasonable doubt by analyzing “whether the error reasonably could have impacted upon the jury’s decision.” Juarez, 572 N.W.2d at 292; see State v. Richardson, 670 N.W.2d 267, 277 (Minn.2003) (stating error warrants reversal if “there is a reasonable possibility that the [error] complained of may have contributed to the conviction.” (alteration in original) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967))).
The exclusion of the PBT results in this case was harmless beyond a reasonable doubt. Bustos argues that the jury would have been greatly influenced by learning that, 8 hours after stabbing Limón, he was still close to two times the legal intoxication limit for drivers, and that these PBT results would have removed any doubt the jurors had as to whether he was intoxicated. But significant other evidence establishing that Bustos was intoxicated was admitted at trial. For example, a police video of Bustos’s arrest was played for the jury, which showed Bustos running and stumbling. There was also testimony by both State and defense witnesses indi- *667 eating that Bustos was intoxicated or had been drinking, including testimony that Bustos’s statement was not taken by police the following morning because there was still an odor of alcohol emanating from him. In light of the other evidence of Bustos’s intoxication, the introduction of the PBT results v/ould have merely been cumulative. See Huff v. State, 698 N.W.2d 430, 437-38 (Minn.2005) (determining that the exclusion of cumulative evidence was not prejudicial).
Furthermore, the State did not argue in its closing that Bustos was not intoxicated; rather, the State argued that notwithstanding Bustos’s intoxication, Bustos still intended to kill Limón. Due to the significant differences in the metabolization of alcohol and the difference in tolerance levels, the level of intoxication reflected by the PBT was of limited probative value as to whether Bustos had the ability to form the requisite intent. Because the jury heard a significant amount of other evidence that Bustos was acting in a manner consistent with intoxication and the PBT results only showed that Bustos had been drinking and not whether he was able to form the requisite intent, there is no reasonable possibility that the exclusion of the PBT results contributed to Bustos’s conviction. Therefore, we conclude that the exclusion of the PBT results was harmless beyond a reasonable doubt, and we affirm the guilty verdict for second-degree intentional murder.
IV.
For the reasons stated earlier, we reverse Bustos’s conviction for first-degree domestic-abuse murder and remand for a new trial. Because we reverse Bustos’s first-degree murder conviction, we do not address his other arguments on appeal. We reject the claim of error in connection with the second-degree intentional murder charge' because the error, if any, was harmless under the applicable standards.
Affirmed in part, reversed in part, and remanded for a new trial on the first-degree domestic-abuse murder charge.

. Although this determination causes us to analyze Bustos's claim under the plain-error standard, because Bustos has met his burden of proof under the more stringent standard, the result would have been the same if we had determined that Bustos had objected and we analyzed his claim under the less stringent harmless-error standard. See State v. Hill, 801 N.W.2d 646, 658 (Minn.2011) (referring to the harmless-error standard as the “less onerous standard” as compared to the plain-error standard).

. Moreover, when the State has offered more than two underlying acts as evidence of the pattern of domestic abuse, jurors may disagree about which acts make up the pattern of abuse. Kelbel, 648 N.W.2d at 702. But the jurors must agree that at least two underlying acts of domestic abuse were proven beyond a reasonable doubt, even if they disagree about which two acts satisfy that requirement. Id.

. The dissent argues that this error did not affect Bustos's substantial rights because the *662 district court allowed defense counsel to address each underlying act, argue why that act did not constitute domestic abuse, and argue that the past-pattern element must be proven beyond a reasonable doubt. Critically, we have said that the State must prove more than one of the underlying acts beyond a reasonable doubt, Cross, 577 N.W.2d at 727, and the district court’s error deprived Bustos of the opportunity to explain to the jury how to apply the standard of proof to the underlying acts. Consequently, a juror could have mistakenly concluded the past-pattern element had been proven beyond a reasonable doubt without also concluding that at least two of the underlying acts had been proven beyond a reasonable doubt. The closing argument for the defense was severely crippled as a consequence of the district court's decision.

. We disagree with the dissent’s assertion that our conclusion necessitates reversal for any district court error involving the proof-beyond-a-reasonable-doubt standard. Plain-or harmless-error analysis requires us to consider the specific record of each case. In the cases cited by the dissent, we determined that the error did not affect the defendant's substantial rights. We come to the opposite conclusion here, for the reasons discussed below. Moreover, because we rely on a combination of errors to grant Bustos a new trial, we offer no opinion as to whether this error, standing alone, would require reversal. This particular set of errors is unlikely to present itself in the future, thus making the dissent's concerns unfounded.

. After Bustos's trial, the definition of "domestic abuse" for purposes of domestic-abuse murder was renumbered from Minn.Stat. § 609.185(c) to Minn.Stat. § 609.185(e). See Act of May 21, 2014, ch. 302, § 1, 2014 Minn. Laws 1847, 1848. The definition itself was unchanged. See id.

. The dissent concludes that the only reasonable interpretation of "similar acts” in the context of Minn.Stat. § 609.185(e) is conduct that is criminal in nature; therefore, the improper jury instruction did not affect Bustos’s substantial rights because the jury would not have believed that the definition of domestic abuse could include noncriminal acts. Although we disagree with the dissent's argument that the unifying thread of "criminal acts" and the doctrine of ejusdem generis would have been obvious to a jury without legal training, we need not resolve that disagreement here because our conclusion is based on a combination of errors.

. The dissent alleges that our analysis "conflates the third and fourth prongs” of the plain-error test. We have demonstrated, however, that the district court's errors regarding the proof-beyond-a-reasonable-doubt standard and the past-pattern jury instruction not only significantly affected Bustos’s trial, but left unchecked would also have a substantial and deleterious effect on future trials (and, not insignificantly, undercuts the historic standard of proof imposed on the State in criminal trials). We suggest, rather, that it is the dissent that merges the two prongs. The dissent states that the errors did not affect Bustos’s substantial rights because the State provided “overwhelming evidence that Bustos had committed a pattern of domestic abuse,” yet later similarly concludes that a new trial is not necessary to ensure the fairness, integrity, or public reputation of judicial proceedings because the evidence of Bustos’s guilt is "overwhelming and uncontroverted.” We are therefore puzzled by the dissent's accusation.

. Minnesota Statutes § 169A.41, subd. 2, states that preliminary screening tests “must not be used in any court action,” apart from the limited exceptions listed.