*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0924**

State of Minnesota,
Respondent,

vs.

Sheldon James Armstrong, III,
Appellant.

**Filed April 18, 2016
Affirmed
Kirk, Judge**

Cass County District Court
File No. 11-CR-14-1392

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Christopher J. Strandlie, Cass County Attorney, Walker, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Cleary, Chief Judge; and Kirk, Judge.

UNPUBLISHED OPINION

**KIRK**, Judge

Following his conviction for attempted first-degree murder, appellant argues that the district court prejudicially erred by allowing a police investigator to provide opinion testimony that appellant appeared in a surveillance video. We affirm.

## FACTS

After a violent incident on August 1, 2014, respondent State of Minnesota charged appellant Sheldon James Armstrong III with attempted first-degree murder, kidnapping, second-degree assault, and motor-vehicle theft. The evidence presented at appellant's three-day jury trial is summarized as follows.

J.H. and appellant met at a casino in approximately July 2014. Appellant gave J.H. his contact information and asked him to keep in touch on Facebook. J.H. and a person with a Facebook account in appellant's name ("Sheldon Armstrong") began communicating periodically through Facebook's instant messenger application. J.H. also saw appellant once at a fair.

On July 31, J.H. and appellant exchanged Facebook instant messages about getting together that night. J.H. agreed to pick up appellant at a gas station. At 12:36 a.m., J.H. messaged that he was arriving at the gas station and asked for appellant's location. Appellant responded with a telephone number at 12:42 a.m. J.H. called the number and spoke to a person whom he understood to be appellant. The person said that he would arrive shortly.

Approximately five to ten minutes later, appellant and another man arrived. Appellant introduced the other man, who was later identified as Travis Paquette, as his brother. After driving for a brief time, the three men exited J.H.'s truck and began walking down a dirt road. Appellant and Paquette then brutally attacked J.H. Appellant repeatedly stabbed him and bound his hands and feet. Later, appellant and Paquette attempted to run over J.H. with the truck. Paquette took J.H.'s cell phone.

Eventually, J.H. managed to escape. At about 2:30 a.m., he knocked on the cabin door of G.H. and his wife, who called 911. J.H. told G.H. that he had been out with appellant and "they" took his truck. J.H. told the responding deputy that appellant and appellant's brother were his assailants.

At approximately 5:45 a.m., the police located J.H.'s truck approximately three-quarters of a mile from G.H.'s cabin. They spotted Paquette walking a short distance away from the truck and arrested him. Officers located appellant inside a nearby residence and took him into custody. Inside appellant's pocket, the police found a cell phone with a case that did not fit the phone and that matched J.H.'s description of his missing cell phone case.

The afternoon of August 1, a police investigator presented J.H. with a photographic lineup. It took J.H. "just seconds" to identify appellant as his assailant. He also identified Paquette from another lineup.

J.H. told the investigator about his Facebook contact with appellant. Using J.H.'s username and password to log into Facebook, the investigator reviewed the series of instant messages between J.H. and "Sheldon Armstrong." The investigator obtained a surveillance video for the time period in question from the gas station where J.H. had met appellant.

3

At trial, the prosecutor asked the investigator to explain what he observed on the video. The district court allowed the testimony over appellant's objection, explaining that it would be "his interpretation as an investigator as to what he's got here and where he went with this from here."

As the video was playing for the jury, the investigator testified that he believed one of the suspects looked like "a Native American male that's consistent with [appellant], with the physical characteristics." Thereafter, the following exchange took place between the prosecutor and the investigator:

> Q: Okay. What exact characteristics are you talking about?
> A: The main characteristics I'm talking about . . . are the sideburns. They come down, and he's got kind of a goatee-type facial hair. He has very dark hair and kind of dark eyes, and those are consistent with [appellant].
> Q: With the clarity of the video, it's virtually impossible to tell for sure, is it not?
> A: Correct.
> Q: You can't clearly see the face?
> A: Right.
> Q: But those are your observations; is that correct?
> A: Yes.

The investigator also testified that he believed the physical characteristics of the other male suspect shown on the video were consistent with Paquette. Later, the prosecutor asked, "So this next frame shows in the same time period the same two individuals walking through; is that correct?" The investigator responded, "Yes, it would be the same time period, and that's [appellant] or who I believe to be, and there's Travis Paquette." As the video moved to the next frame, the investigator continued:

4

A: And this is all during the same time frame. That individual that was just in the edge of the frame there that should be [appellant].
Q: The person at least that you believe is –
A: I believe, yes. He's wearing shorts.

In addition, the investigator testified that he reviewed the time and date stamps on the video images and concluded that they were consistent with other information he had received during the investigation.

The investigator testified that, while logged into his personal Facebook account, he searched for "Sheldon Armstrong" and found an account with a profile photograph "consistent with what [he] had seen of [appellant] up to that point," including through photographs and personal contact. The investigator noted that Paquette was identified as a "brother" on this Facebook page.

At trial, J.H. identified appellant as one of his assailants in the courtroom. J.H. also identified a screenshot of a Facebook profile photograph for "Sheldon Armstrong" as depicting appellant, which was consistent with photographs of appellant at the time of his arrest. When asked by the prosecutor if appellant appeared "exactly the same" at trial as he did on August 1, J.H. noted that, on August 1, appellant had a goatee and sideburns, was wearing different clothes, and was not wearing glasses.

The jury found appellant guilty as charged. The district court entered judgment of conviction and imposed a sentence on only attempted first-degree murder.

This appeal follows.

**D E C I S I O N**

**I.**  **The district court did not abuse its discretion in admitting the investigator's identification of the men in the video.**

On appeal, a party who objects to the admission of evidence at trial bears the burden of proving that the district court abused its discretion by admitting the evidence and that it was prejudicial. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003). In *State v. Ali*, the Minnesota Supreme Court held that the district court did not abuse its discretion in permitting a police officer to testify that, based on review of surveillance videos, she and her partner eliminated one murder suspect as an assailant and determined the identity of the shooter's accomplice. 855 N.W.2d 235, 247-50 (Minn. 2014).

The *Ali* court explained that the testimony "was important context evidence considering that [the] defense was centered on the contention that [the defendant] had been misidentified." *Id.* at 249. The supreme court also relied on the fact that the district court gave a limiting jury instruction that the testimony was to provide context for the investigation and that the jury must draw its own conclusions about who may be depicted in the videos. *Id.*; *see also State v. Griller*, 583 N.W.2d 736, 743 (Minn. 1998) (holding that the district court did not abuse its discretion in admitting evidence of events that triggered an investigation and excavation of the defendant's backyard as "context for an investigation"); *State v. Czech*, 343 N.W.2d 854, 856-57 (Minn. 1984) (upholding admission of the defendant's taped statement in which he implicated himself in other crimes, concluding that the whole tape was necessary to give the jury the proper context

6

for the defendant's statement and to reveal to the jury why the police were conducting an undercover investigation).

Here, appellant argues that the district court erred in allowing the investigator's opinion testimony about who was depicted on the surveillance video, either as a lay or expert witness. The state contends that the investigator's testimony was properly admitted as providing context for the investigation, akin to that in *Ali*, *Griller*, and *Czech*. We agree with the state.

As in *Ali*, appellant's defense theory at trial was misidentification. 855 N.W.2d at 249. The investigator's testimony regarding the surveillance video helped explain to the jury why the investigation focused so quickly and intently upon appellant and Paquette, but also why law enforcement continued efforts to conclusively identify these men as J.H.'s assailants.

The investigator explained his observations of the video, leading to his "belief" that the video depicted appellant and Paquette, rather than simply declaring them to be the men in the video. He stated that the appearance of one of the men in the video was "consistent with" appellant's, noting certain physical characteristics. The investigator also acknowledged that the video does not clearly show the man's face.

Ideally, in order to clarify the nature of the testimony for the jury, the district court would have limited the investigator's testimony to his *past* thoughts upon viewing the video, provided a limiting jury instruction delineating that the testimony was to give context to the investigation, and directed that the jury members draw their own conclusions. *See id.* at 248. However, the district court did instruct the jury about how to evaluate

7

identification testimony and asked them to do so "carefully." *See* 10 *Minnesota Practice*, CRIMJIG 3.19 (2015).

On these facts, we conclude that the district court did not abuse its discretion in admitting the investigator's identification of the men in the video as context for the investigation.

**II.     The investigator's testimony was also admissible as lay opinion under Minn. R. Evid. 701.**

Minn. R. Evid. 701 provides:

> If the witness is not testifying as an expert, the witness'[s] testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue.

Under this rule, "the emphasis is not on how a witness expresses himself or herself—[i.e.], whether in the form of an opinion or a conclusion—but on whether the witness personally knows what he or she is talking about and whether the testimony will be helpful to the jury." *State v. Post*, 512 N.W.2d 99, 101 (Minn. 1994). Further, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. For example, in *State v. Washington*, where a 911-call recording was admitted into evidence, we held that the 911 operator's testimony that she believed the caller was being assaulted was admissible lay opinion testimony under rule 701. 725 N.W.2d 125, 137 (Minn. App. 2006), *review denied* (Minn. Mar. 20, 2007).

8

In arguing that the investigator's testimony was inadmissible, appellant cites caselaw under rule 701 of the Federal Rules of Evidence, which is very similar to Minn. R. Evid. 701. For example, appellant relies on *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984), which held that a lay witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible "where the witness is familiar with the defendant's appearance around the time the [] photograph was taken and the defendant's appearance has changed prior to trial." *See also United States v. Stormer*, 938 F.2d 759, 762 (7th Cir. 1991) (affirming admission of officers' lay opinion testimony identifying the defendant from surveillance photographs, due to officers' familiarity with the defendant's appearance, the defendant's disguise during the crime, and the poor quality of the photographs).

Contrary to appellant's assertions, these cases do not require contact with the defendant prior to the offense, extensive contact with the defendant prior to the trial, or a considerable change in appearance between the photograph or video and trial. Here, prior to his testimony, the investigator had seen photographs of appellant and had personal contact with him. Appellant had also made some noteworthy changes to his appearance, as he was wearing glasses at trial and removed his facial hair. Further, the surveillance video's quality is not high, and the men appear only briefly on the video.

It is true that courts should be cautious about the influence of a law enforcement officer's opinion on ultimate issues. *See State v. Hogetvedt*, 623 N.W.2d 909, 915 (Minn. App. 2001) (stating that, "[g]iven [the officer]'s status as a police officer," his opinion as to guilt "may have unduly influenced the jury"), *review denied* (Minn. May 29, 2001).

9

However, the investigator's testimony was rationally based on his knowledge of appellant's appearance at the time of the offense and his perception of the video. The record supports a conclusion that the investigator had personal knowledge relevant to the content of the surveillance video and that the testimony was helpful to the jury. *See Post*, 512 N.W.2d at 101. Consequently, the testimony was also admissible as a lay person's opinion under rule 701.

Because we conclude that the testimony was admissible as either context for the investigation or lay opinion, we do not reach the question of whether it was admissible as expert opinion under Minn. R. Evid. 702.[1]

**Affirmed.**

---

[1] In *Ali*, the supreme court did not decide whether the testimony was admissible as lay or expert opinion evidence, noting the rule of "multiple admissibility," i.e., that even if evidence is inadmissible under one rule, it may be "admissible if relevant and offered for some other purpose not forbidden by the rules of evidence." 855 N.W.2d at 250 n.13 (quotation omitted).